548 A.2d 582

**COMMONWEALTH of Pennsylvania**

**v.**

**Joseph HESS, Appellant.**

Superior Court of Pennsylvania.

Submitted May 23, 1988.

Filed Sept. 30, 1988.

222

Charles P. Mirarchi, III, Philadelphia, for appellant.

Donna G. Zucker, Assistant District Attorney, Philadelphia, for Com., appellee.

Before McEWEN, HOFFMAN and HESTER, JJ.

HESTER, Judge:

Joseph Hess appeals from the judgment of sentence entered November 10, 1986, in the Court of Common Pleas

of Philadelphia County following his conviction by a jury of murder of the second degree, robbery, possession of an instrument of crime, and conspiracy. Appellant was tried with three co-participants. All four were convicted. Appellant was sentenced to a term of life imprisonment for the murder and a consecutive five to ten year term for the conspiracy. He was given a suspended sentence on the charge of possession of instrument of crime, and for purposes of sentencing, robbery merged with murder. In this appeal, appellant raises numerous issues of trial error. Finding no merit to them, we affirm.

Late in the afternoon of January 21, 1985, appellant and co-defendants Ronald Lynch, Stanley Oliver and David Walker gathered in Brenda Walker's apartment, located in a high-rise government project in Philadelphia. The four men decided to rob David Green, an incense vendor who was selling his wares in the building. Appellant carried a thirty-eight caliber revolver, and he and the three others approached Green in a stairwell between the eighth and ninth floors. Appellant pointed the gun at him, and the conspirators demanded his money. One of the four put his hand in Green's pocket, attempting to remove cash. Green resisted. At a distance of four feet, appellant discharged the gun, and a bullet struck Green. The conspirators retreated to Brenda Walker's apartment. Mortally wounded, Green ran to the landing of the seventh floor and collapsed. Lying in a pool of blood, he died within minutes.

At trial, David Smith testified that earlier that afternoon, he visited his girlfriend, Bonnie Clark, who lived on the tenth floor of the high-rise. Smith testified that he rode up the elevator with four men, two of whom he recognized as co-defendants Walker and Oliver, and that later, while he was in Ms. Clark's apartment, he heard a scuffle and the sound of a gunshot coming from the stairwell. Peering out the door, he saw David Green, the incense vendor, running down the steps with three men in pursuit. Smith recognized two of the men as co-defendants Oliver and Walker. The three men stopped upon seeing Smith and ran back up

the stairs. Smith walked to the seventh floor and, upon discovering the body of David Green, summoned police. A short time later, a crowd gathered around the body. Co-defendants Walker and Oliver were among the bystanders. Smith heard Walker say, "Wow, ain't that a shame." A third man joined Walker and Oliver, but Smith could not identify him since only his legs were visible as he stood on the stairs. Co-defendant Oliver asked the unidentified man, "What are you going to do?" The man answered, "I'm going home." He and Oliver ran up the steps.

At trial, a statement given to the police by appellant was read to the jury. The court cautioned the jury that it was not to be used against any defendant except appellant. In the statement, appellant indicated that he and three others conspired to rob Green and that appellant shot Green when Green attempted to take appellant's revolver from him. Appellant's statement was redacted to exclude the actual names of the other defendants. Inserted in their places were phrases such as "the other person."

Co-defendant Lynch's redacted statement was also read into the record. That statement includes the following:

I was coming down from the 17th floor inside 1515 Hemberger Way and I saw the other persons. They called me over. We went in Brenda Walker's apartment, No. 1406. We were all smoking a "J", parenthesis, marijuana cigarette, end of parenthesis, and somebody knocked at the door. It was the Incense Man. They said there [sic] were going to rob the Incense Man. They asked me if I was down with them. I told them I'm not about that stuff. They called me a chicken. Brenda Walker told me I had to leave if I wasn't down. The other persons walked out of the apartment and I walked out after them. I walked down the 01 side of the fire tower with one of them. The other two walked down the other stairway. The Incense Man was walking down the steps on the other stairway, the same stairway that the other two were walking down. The Incense Man stopped on all the floors trying to sell the incense. He knocked at

some of the doors. The one I was with stopped at the 9th floor. I was standing on the steps between the 9th and the 8th floor. One of the others was hiding in the hallway on the 9th floor. I didn't see where one of the persons went. I think he went down to about the 8th or closer to the 7th floor. The Incense Man went in the stairway to go on the 9th floor landing and one of the persons pulled a gun on the Incense Man. He stuck the gun in the Incense Man's face. The Incense Man had some lit incense and tried to stick it in his face. The Incense Man was holding the door. Before this he hit the Incense Man in the head with the gun. The Incense Man was holding the door and he was on the other side of the door. The Incense Man ran down the steps and he shot at him one time. Two of the persons went up to an apartment. I walked up a flight behind them. They went in the apartment. I stood in the hallway. He told me that I better not say anything. I went home. I stayed in the house a couple of days. He was looking for me and told me that if I tell on him he was going to get me the same way.

Notes of Testimony (N.T.), 2/2/86, at 141–42.

■ Appellant first argues that the trial court erred in refusing to allow Valerie Mond to testify on his behalf. He contends that Ms. Mond, a social worker at Holmsburg prison, would have testified that appellant told her that he was beaten by the police when he was arrested. This testimony, according to appellant, should have been admitted to show that the statement which he made to the police was not voluntarily given. We find no merit to this contention.

At a pre-trial suppression hearing, Valerie Mond testified that she first met appellant on March 21, 1985, more than three weeks after his arrest. She stated that "on several occasions [appellant] said that when he was arrested he was beaten by the police...." N.T., 1/30/86, at 5. The court refused to allow this testimony to be repeated at trial, holding that it was hearsay.

Pennsylvania recognizes a "state of mind" exception to the hearsay rule. *See e.g., Commonwealth v. Ilgenfritz,* 466 Pa. 345, 353 A.2d 387 (1975).

Often a person's state of mind, knowledge, intent, motive, emotion, competency, or sanity is relevant in a case. That person's contemporaneous statements are an obvious source of information as to the relevant state of mind, and such statements are admissible under the state of mind exception to the hearsay rule.

. . . .

There are two reasons which support the admissibility of evidence coming within the state of mind exception. One is the necessity which is said to arise from the fact that state of mind is often impossible to prove in the absence of such statements. The second reason is that such statements are said to be reliable because of their spontaneity—much as spontaneity is viewed as creating reliability for the present sense impression and excited utterance exceptions to the hearsay rule. State of mind is one of the hearsay exceptions that was formerly considered under the res gestae label although it is now recognized as a separate exception.

L. Packel & A. Poulin, *Pennsylvania Evidence* § 803.3 (1987). If statements to a third party tend to show state of mind only circumstantially, they are not hearsay. *Commonwealth v. Williams,* 307 Pa. 134, 160 A. 602 (1932); *Commonwealth v. England,* 474 Pa. 1, 375 A.2d 1292 (1977). However, even statements which are not barred by the hearsay rule may be inadmissible if they were made at a time so remote from the incident to which they purportedly pertain that their probative value is *de minimis. Commonwealth v. England, supra.* As the authorities cited above suggest, state of mind evidence, whether hearsay or not, is admissible if it is probative of the speaker's mind at the time of the pertinent incident.

In the instant case, regardless of whether the statements which appellant made to Ms. Mond should technically be regarded as hearsay, we find that the trial court did not

abuse its discretion in excluding them. The court noted that the statements were made too remote in time from the alleged beating to be probative of appellant's state of mind.

Whether proffered evidence is too remote to be probative is a determination left to the trial court's discretion. *Commonwealth v. Gibson*, 363 Pa.Super. 466, 526 A.2d 438 (1987). There is no rigid rule as to the length of time before which evidence may be said to have lost its probative value. *Commonwealth v. Ulatoski*, 472 Pa. 53, 371 A.2d 186 (1976). Instantly, more than three weeks passed from the time of the alleged beating and the time that appellant first could have reported it to Ms. Mond. The state of mind which appellant alleges was induced by the beating, *i.e.*, fear and coercion, could hardly have persisted up to the time he made the statements to Ms. Mond. It is more than likely that the powers of reflection and deliberation returned to him, negating any reasonable chance that the statements were a spontaneous report of his state of mind at the time of the beating. Therefore, we find no abuse of discretion in the trial court's refusal to admit the testimony.

■ Appellant next argues that the trial court erred in preventing a witness from answering a question which, again, was designed to show appellant's state of mind at the time he gave his statement to the police. Appellant's counsel called Chuck Stone, a columnist for a Philadelphia newspaper, to the stand. Appellant had turned himself into Mr. Stone to be arrested on the instant charges. At trial, Mr. Stone was asked by appellant's counsel, "Did you ever receive any correspondence from Mr. Hess thereafter?" N.T., 2/5/86, at 22. The prosecution objected and the court refused to allow Mr. Stone to answer. Appellant argues on appeal that he wrote to Stone and complained of being beaten by the police when he was arrested. He claims that Stone's testimony concerning the correspondence would have tended to prove the involuntariness of the statement that he made to the police at the time of his arrest.

Appellant's brief fails to specify when this alleged correspondence to Chuck Stone was written. The trial court

treated this argument the same as the previous contention with respect to Ms. Mond's testimony—that is, the evidence was too remote to be admitted. Appellant's failure to specify the time when the letter was written precludes us from reviewing the merits of the contention. As explained *supra,* the timeliness factor is crucial in a state of mind analysis. It is most unlikely that appellant composed a letter to Stone while still experiencing the fear and coercion which he suggests accompanied the arrest. This contention does not merit relief.

■ Appellant also contends that the following remarks by the prosecution in closing constitute reversible error:

> But Mr. Mirarchi [appellant's counsel] said in his opening statement he was going to call Mr. Hess. Now, understand that in this case four defendants are charged with murder. They have all elected to remain silent. You cannot, you must not, under the law, infer anything adverse to them. But did you really think when Mr. Mirarchi said that to you in his opening that he ever intended to allow Mr. Hess to take the witness stand and be cross-examined by me? But that's what he told you in his opening.

N.T., 2/10/86, at 114.

Appellant contends that these remarks improperly referred to the fact that he chose to exercise his right to remain silent. Moreover, he complains that the remarks were made despite the court's earlier admonition that the prosecution should not refer to the fact that the defendants did not testify. *Id.* at 3–4. Appellant is not entitled to relief on the basis of this contention.

The comments about which appellant complains were made in fair response to comments made by his own counsel in his opening to the jury. Appellant's counsel stated to the jury that appellant would testify, and he proceeded to relate what appellant would say:

> The defense, according to Mr. Hess, will show that a month after the incident information was gotten to Mr. Hess, Mr. Hess voluntarily surrendered. In fact, he

turned himself into Daily News' Chuck Stone, I believe. He realized, as I said, there was a warrant. He had nothing to hide. He turned himself in and let the matter evolve in the court system. A statement was given with regard to someone who said they were an eyewitness to the police. I can tell you right now, that statement given to the police names people, gives descriptions of the person and/or persons who they saw commit the crime. Neither Joseph Hess, nor any of these defendants, were named in that statement. There's a statement signed by the defendant, Joseph Hess. Joseph Hess will tell you that Joseph Hess did not make a voluntary statement to the police or anyone else. He'll tell you what happened. He'll tell you that yes, that is his signature that appears at the bottom of the statement, but he did not give any answers to any questions. In fact, he'll state no questions were asked. He was asked to sign the statement. He refused. He was pressured into signing the statement. He still refused. It wasn't until he was struck repeatedly, that because he wanted the beating to stop, did he then sign the confession. If he wanted to confess he could have confessed to Chuck Stone. But he didn't. He'll tell you the manner in which it happened. If you put it together with the fact that a month before that a statement was given that someone else did it, we have to look real close as to why. As I said, you'll hear from the defendant as to why his name gets on the bottom of the statement.

N.T., 1/31/86, at 69–71.

It is well-settled that a prosecutor may not comment adversely on the defendant's refusal to testify. *Commonwealth v. Crawley*, 514 Pa. 539, 526 A.2d 334 (1987); *Commonwealth v. Travaglia*, 502 Pa. 474, 467 A.2d 288 (1983); *Commonwealth v. Torres*, 329 Pa.Super. 38, 477 A.2d 1350 (1984). However, our courts have long recognized the principle of "fair response"—that the prosecution may properly respond to defense arguments. *Commonwealth v. Torres, supra* (where prosecution's statements reflected

adversely on defendant's failure to testify, one of factors cited to support holding of insufficient prejudice to warrant new trial was that comments were response to defense assertion); *Commonwealth v. Kahley,* 467 Pa. 272, 356 A.2d 745 (1977) (defendant's fifth amendment rights not violated where prosecution elicits testimony concerning defendant's post-arrest silence so long as the reference to silence is not designed to infer guilt but is advanced to counter misleading or improper impression created by defense). *See also Commonwealth v. Gwaltney,* 497 Pa. 505, 442 A.2d 236 (1982); *Commonwealth v. Barren,* 501 Pa. 493, 462 A.2d 233 (1983); *Commonwealth v. DeHart,* 512 Pa. 235, 516 A.2d 656 (1986); *Commonwealth v. D'Amato,* 514 Pa. 471, 526 A.2d 300 (1987); *Commonwealth v. Toledo,* 365 Pa.Super. 224, 529 A.2d 480 (1987); *Commonwealth v. Chimenti,* 362 Pa.Super. 350, 524 A.2d 913 (1987).

The comments by the prosecution were advanced to counter the inaccurate statement made by appellant's counsel at the start of trial. That comment, quoted *supra,* not only asserted that appellant would testify but detailed what he would say. In fact, appellant did not testify. Therefore, it was entirely proper for the prosecution to comment on appellant's failure to testify, and we agree with the trial court's reasoning in refusing to exclude the prosecutor's comments:

> [N]ot allowing the prosecutor to comment on this would have given the defense an unfair advantage.... To prohibit such comments would open the door for a whole new style of defense, i.e., have defense counsel say what his client is going to say but then don't call him. In other words, a way for defense to get testimony in without cross examination.

Trial court opinion at 9–10. This argument does not entitle appellant to relief.

Appellant also claims that in commenting on appellant's election not to testify, the prosecution disparaged the defense strategy and implied that the defense had something to hide. Moreover, he claims that in discussing the testimo-

ny of defense witness Leroy Crawford, the prosecutor disparaged the defense strategy and indicated his own opinion of defense witnesses. This assertion is without merit.

In assessing appellant's contentions, we are mindful that a prosecutor must limit his statements to the facts introduced at trial and the legitimate inferences therefrom. *Commonwealth v. Bricker*, 506 Pa. 571, 487 A.2d 346 (1985) (plurality opinion). Moreover, the Commonwealth is afforded reasonable latitude in fairly presenting its version of the case to the jury. *Commonwealth v. Upchurch*, 355 Pa.Super. 425, 513 A.2d 995 (1986). The Pennsylvania Supreme Court recently reaffirmed the "unavoidable prejudice test" as articulated in *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975), is to be used in determining the impact of prejudice in closing arguments.

> [W]here the language of the district attorney is intemperate, uncalled for and improper, a new trial is not necessarily required. *Commonwealth v. Crittenton*, 326 Pa. 25, 31, 191 A. 358 (1937); *Commonwealth v. McHugh*, 187 Pa.Super. 568, 577, 145 A.2d 896 (1958). The language must be such that its 'unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict.' *Commonwealth v. Simon*, 432 Pa. 386, 394, 248 A.2d 289, 292 (1968). *See also, Commonwealth v. Meyers*, 290 Pa. 573, 139 A. 374 (1927). The effect of such remarks depends upon the atmosphere of the trial, *Commonwealth v. Dickerson*, 406 Pa. 102, 110, 176 A.2d 421 (1962); *Commonwealth v. Del Giorno*, 303 Pa. 509, 519, 154 A. 786 (1931), and the proper action to be taken is within the discretion of the trial court. *Commonwealth v. Silvis*, 445 Pa. 235, 237, 284 A.2d 740 (1971); *Commonwealth v. Simon, supra.*

*Commonwealth v. Johnson*, 516 Pa. 527, 530–32, 533 A.2d 994, 997 (1987). The *Johnson* court went on to state, "Under this test, we are required to judge whether the

mental bias of the jury has been so 'fixed' as to implicate the truth-finding function itself." *Id.*

Instantly, as indicated *supra*, the prosecutor's comments with respect to appellant's silence were in fair response to his counsel's earlier remarks.

With respect to the other comments by the prosecutor, we note that Leroy Crawford had testified for the defense that the men on trial were not guilty and that he had given the police a statement to that effect, signaling out two other men as the perpetrators.

In fact, Crawford had given police information to the effect that they had arrested the wrong men and that certain others had actually committed the crime. Crawford was subsequently arrested in connection with giving the police false information and charged with hindering apprehension. Crawford pled guilty to the charge.

In the instant trial, Crawford repeated his claim that the police had arrested the wrong men. The prosecutor, in summation, attempted to attack this testimony by referring to the fact that Crawford had pled guilty to hindering apprehension:

But the important thing about Mr. Crawford is not only what he said and how he said it and about his background. There's only one thing that is really necessary that you understand and I can't say this clear enough or enough times. Here is a man who gave a statement on the 25th and went before a Judge, as he told you, and pled guilty saying that the statement I gave was not true, and he pled guilty and he received one and a half to three years, and he told you about a recantation. That was the first question I asked, what is a recantation, and he knew. I didn't find out until I was ten years into my career, and I've been doing this for 20 years, what actually a recantation was. But Mr. Crawford knew because he researched it in the law library. But Mr. Crawford pled guilty, admitted to another Judge at another time, in another courtroom that what he said in that statement was a lie. What can be clearer than that? When he comes in front

of you and if he makes any other statement, his appeal that he told you he had, why did he plead guilty? Because he had an incompetent lawyer. But that's why he pled guilty. That's why he admitted it was a lie. If he makes any other statement, he can kiss good-bye any appeal that he might have. You will recall Mr. Crawford—

MR. MIRARCHI: Objection.

THE COURT: The jury will receive the law from me.

MR. SAGEL: You will recall Mr. Crawford was on the stand for maybe a half hour of direct-examination, on the stand for maybe an hour, an hour and 15 minutes on cross-examination. You will recall that I had not completed my cross-examination and that we recessed on whatever day it was at 4:00. Then the next day you came in. That was the day we had to sit around, as you know. You came into court. I don't remember the time. But it was well after 3:00. Mr. Crawford was sitting on the stand and then later you were excused. Then the next day, without my cross-examination being finished, Mr. Crawford went poof, he no longer was on the stand. So I didn't even get into the recantation.

N.T., 2/10/86, at 120–22. The court cautioned the jury that no negative inference should be drawn from the fact that Crawford's cross-examination had not been completed. *Id.* at 124.

We cannot say that the prosecutor's remarks, confined to an isolated portion of a lengthy and heated trial, so swayed the passions of the jurors that they could not deliberate fairly. This argument merits no relief.

■ Appellant next argues that a new trial should be granted on the basis that a juror, Charlotte Silver, lied during voir dire when she indicated that she was not familiar with the defendants or with the neighborhood where the incident occurred. After the verdict was entered, Ms. Silver approached defense counsel and informed them that she had known two of the four co-defendants for some time. She declined to comment further, and the court subsequent-

ly conducted several hearings to determine whether Ms. Silver's knowledge of the co-defendants affected the verdict. The court concluded that "[i]t cannot be said from all the testimony taken that Charlotte Silver harbored any bias or prejudice against any of these defendants." We agree.

At one of the hearings on the matter, Ms. Silver stated that she had owned and operated a store two blocks from the scene of the incident from 1971–1979. N.T., 4/16/86, at 16. She testified as follows concerning her previous relation with the defendants:

THE COURT: When we went through the jury selection process, I know that I asked you whether you knew or had any close relationship with any of the four defendants who were here in the Court today.

MISS SILVER: I believe at that time that I probably answered no, because I didn't have a close relationship with any of these defendants and it is quite possible that I did not see the defendants because perhaps I concentrated upon your question or I concentrated upon the lawyers or the prosecutor or I just stared into empty space. I kind of think that it is my fault, also.

THE COURT: Are you suggesting that you had ever seen any one of these four defendants, you had spoken to, or knew any of the defendants before their trial?

MISS SILVER: Yes. When I was in my story [sic] I recognized the young man who was a customer of mine.

. . . .

MISS SILVER: It is quite possible that there is a second young man here, but I will not say yes or no. The young man that I do recognize was a customer of mine and it would be Mr. Walker.

THE COURT: The other person?

MISS SILVER: I did not know his name. I do not recognize Mr. Hess. I do not recognize Mr. Oliver. Or the third young man, who is nameless. It is quite possible this young man came into my store and at the time that he came in he would have been much younger, he would have been approximately 14 or 15 years old.

THE COURT: So you're saying that you possibly know Mr. Lynch?

MISS SILVER: That's right. Mr. Lynch did not purchase anything from me more than possibly a pack of chewing gum, but he came into my store to see the butcher who worked in the back of the store.

. . . .

BY MR. MYERS:

Q. But you said that while you were sitting in the jury box before there was a decision, there was a possibility in your mind that you had to wrestle with that you may have known the defendants—I mean the two of them, Lynch and Walker, there was possibility you may have known them?

A. I said that I wrestled with myself about Walker.

Q. What about Lynch?

A. I didn't wrestle about Lynch. I looked at him from time to time. He's the same little cry baby that came into Parker's Meat Market.

Q. Was that the same guy that came in that when he came in you went to the cash register when he walked in, fearing that he might rob you?

Q. I never said—I said when Lynch came I worked behind—I stood behind the counter and my cash register. Lynch walked passed me and each time he did he gave me a dirty look and he went to the back of the store to talk to Robert Rice, my butcher.

*Id.* at 18–20, 68–70. The reference to co-defendant Lynch being a "cry baby" presumably referred to the fact that he was crying after the verdict was entered.

Ms. Silver stated that she had known co-defendant Walker when he was a teen-ager. "[H]e was a nice fellow," she said. "I never had any difficulty with Mr. Walker. . . . I would have hired Mr. Walker to work for me." *Id.* at 22. When asked about Lynch, she stated:

MISS SILVER: Mr. Lynch is of a different nature than Mr. Walker. Mr. Lynch, when he was 15 years old, 14 or 15, used to enter my store and walk up my aisle where I

stood. We faced each other. I stood behind the counter and operated the cash register. Mr. Lynch used to give me a dirty look each time he entered my store and walked to the rear to talk to Robert Rice, our butcher. When Mr. Lynch left the store, he in turn came right down the same aisle and gave me another dirty look and went out the front door. However, I will say in behalf of Mr. Lynch that I do not consider Mr. Lynch a thief, but a conversationalist with my butcher.

THE COURT: Did you have any reason to know or did anyone tell you that Mr. Lynch had ever been involved in any criminal activities at all?

MISS SILVER: I think Mr. Lynch smoked pot.

*Id.* at 24. Ms. Silver stated that she had not seen either Walker or Lynch for approximately seven years. *Id.* at 33. When asked if she followed the law and the evidence as the court gave it to her, she stated, "I tried to." *Id.* at 35. Moreover, she stated that she never told any of the other jurors that she might have known Walker or Lynch. *Id.* at 35. She testified as to why she did not approach the court during the trial to advise it that she might have known Walker.

MISS SILVER: .... I wrestled with that question. I wrestled, yes, I did. Because I am known to be fair. I am known to be honest. I have nothing to be afraid of. I did wrestle with that question for many, many days. I think if I am going to approach Judge Halbert, I think that I should have damned well have had correct information.

*Id.* at 47–48.

We note that Ms. Silver did not recognize appellant. As the excerpts above indicate, Ms. Silver's previous but limited acquaintance with two of the co-defendants when they were customers in her store can hardly be said to have biased her against them. Therefore, we do not believe that the court abused its discretion in refusing to declare a mistrial.

■ Appellant next argues that the court erred in allowing a Commonwealth exhibit, a diagram, to be circulated among the jurors. The diagram was drawn by appellant in connection with the statement he gave the police and depicted the scene of the crime with markings indicating the places where the actors stood. We find no merit to this contention.

The decision to admit a chart or diagram is left to the sound discretion of the trial court. *Commonwealth v. Cullen,* 340 Pa.Super. 233, 489 A.2d 929 (1985). Such aids to the jury are admissible where they assist in clarifying facts. *Id.* "If the trial court could properly conclude that the exhibit would be helpful to the jury, the decision to admit the exhibit will likely be upheld." L. Packel & A. Paulen, *Pennsylvania Evidence* § 416.3 (1987).

Instantly, appellant's argument that the diagram was prejudicial is posited without specificity. We find no abuse of discretion in admitting it as it served the useful purpose of illustrating what might have been confusing evidence concerning the physical layout of the crime scene.

■ Finally, appellant argues that the court erred in denying his motion for severance. He contends, again without specificity, that severance was necessitated by the complexity of the evidence, the fact that evidence admissible against a co-defendant was not admissible against appellant, and that appellant and a co-defendant had antagonistic defenses. This argument merits no relief.

It is well-settled that defendants may be tried together if they are alleged to have participated in the same act or transaction or series of acts or transactions. Pa.R.Crim.P. 1127(A)(1)(b); *Commonwealth v. Morales,* 508 Pa. 51, 494 A.2d 367 (1985); *Commonwealth v. Jackson,* 451 Pa. 462, 303 A.2d 924 (1973). This court consistently has held that the decision whether to sever trials is within the discretion of the trial court and will not be disturbed on appeal absent a manifest abuse of discretion. *See Commonwealth v. Morales, supra.* It is well-established that in a trial involving a conspiracy, the co-conspirators generally should be

tried together. *Commonwealth v. Katsafanas,* 318 Pa.Super. 143, 464 A.2d 1270 (1983). In order to sustain the burden of showing that the trial court committed a manifest abuse of discretion for failing to order separate trials, a defendant must demonstrate that the defenses were conflicting and irreconcilable and that there existed a danger that, solely on the basis of the conflict, the jury unjustifiably inferred that the defendants were guilty. *Commonwealth v. Orlowski,* 332 Pa.Super. 600, 481 A.2d 952 (1984). "The defenses must conflict at the core; mere divergence on peripheral matters or mere hostility between co-defendants, does not require severance." *Commonwealth v. Bennie,* 352 Pa.Super. 558, 566–67, 508 A.2d 1211, 1215 (1986).

Instantly, appellant's argument is so general that it precludes effective appellate review. We do not find that the evidence was so complex that severance was the proper remedy. *See* our recitation of the facts, *supra.* Nor do we find persuasive the argument that evidence admitted against a co-defendant would have been inadmissible against appellant if he were tried alone. Assuming this assertion refers to the admission of co-defendant Lynch's statement, we note that this statement was redacted to eliminate the actual names of the co-defendants. This court has held that it is improper to find a co-defendant prejudiced by the admission of the other defendant's redacted statement *if the statement itself* does not tend to identify the co-defendant as a participant in the crime. *Commonwealth v. Rawls,* 276 Pa.Super. 89, 419 A.2d 109 (1980).[1]

1. Our supreme court's decision in *Commonwealth v. Chestnut,* 511 Pa. 169, 512 A.2d 603 (1986), does not mandate a different result. There, defendant and co-defendant Floyd were tried together for robbery and conspiracy. Another co-participant, Rita Hatten, died before trial. Ms. Hatten had testified at three preliminary hearings, implicating defendant and Floyd each time. Hatten's statements from the hearings were read at the trial of defendant and Floyd. The statements were redacted; the one from Floyd's preliminary hearing was edited to exclude defendant's name, and the one from defendant's hearing excluded Floyd's name, inserting in place the phrase "the other person." Defendant was convicted. On appeal, he challenged as prejudicial the admission of Hatten's redacted statement from Floyd's preliminary hearing. Our supreme court found no error.

In *Commonwealth v. Council,* 355 Pa.Super. 442, 513 A.2d 1003 (1986), we recognized that a trial court may deny severance where a co-defendant's statement has been redacted to eliminate reference to the other co-defendants. The interests of judicial economy commend redaction over severance in a joint trial of co-conspirators.

With respect to the assertion that appellant and co-defendant had antagonistic defenses, we note, again, that the lack of specificity in this assertion precludes effective appellate review. We do not believe that co-defendant Lynch's statement, which was redacted to exclude appellant's name, constituted "conflicting" defense since it did not refer to appellant by name.

As the excerpts above indicate, Ms. Silver's previous but limited acquaintance with two of the co-defendants when they were customers in her store can hardly be said to have

The court noted with approval the rule set forth in *Commonwealth v. Rawls, supra,* that in order to determine whether a redacted statement is prejudicial to a co-defendant, it should not be viewed in the context of other evidence. However, the court did not rest its holding this basis, noting that in the "unique circumstances" of the case, Hatten's redacted statement from Floyd's preliminary hearing unavoidably provided cumulative testimony against defendant. "[Hatten's] testimony against each co-defendant was strikingly similar, although not identical, and the jury could not have failed to understand that [defendant] was 'the other person' referred to in the testimony implicating Floyd, especially since it had already heard the testimony against [defendant]." *Id.,* 511 Pa. at 174, 512 A.2d at 605. The court proceeded to discuss the assertion in terms of a harmless error analysis. It found that the statement provided only cumulative evidence against defendant; the other evidence against him was strong, untainted, and uncontradicted.

*Chestnut* does not compel us to analyze the instant assertion of error by using a harmless error test. In *Chestnut,* it was only reasonable for the jury to regard all of Ms. Hatten's statements together. As such, it was obvious that she was referring to defendant in the statement she made at Floyd's hearing even though defendant's name was excised therefrom. The effect was as if defendant's name had not been excised and was tantamount to permitting Ms. Hatten to testify against defendant without being cross-examined.

Instantly, unlike the redacted statement in *Chestnut,* co-defendant Lynch's redacted statement did not emanate *from the same source* as other evidence clearly linking appellant to the crime. We find *Commonwealth v. Rawls, supra,* controlling, and need not resort to a harmless error test.

biased her against them. Therefore, we do not believe that the court abused its discretion in refusing to declare a mistrial.

Judgment of sentence affirmed.