635 A.2d 1042

**COMMONWEALTH of Pennsylvania**

v.

**Stanley OLIVER, Appellant.**

Superior Court of Pennsylvania.

Submitted Aug. 16, 1993.

Filed Nov. 4, 1993.

Reargument Denied Jan. 14, 1994.

2

Norris E. Gelman, Philadelphia, for appellant.

Kathy L. Echternach, Asst. Dist. Atty., Philadelphia, for the Com., appellee.

Before OLSZEWSKI, DEL SOLE and JOHNSON, JJ.

OLSZEWSKI, Judge:

This case comes before us as an appeal *nunc pro tunc* from the judgment of sentence entered in the Philadelphia County Court of Common Pleas. Appellant Stanley Oliver was convicted of second-degree murder, robbery and criminal conspiracy. 18 Pa.C.S.A. §§ 2502, 3701, 903. Oliver's trial counsel timely appealed the judgment of sentence (for life imprisonment plus five to ten years), but that appeal was dismissed without prejudice for failure to file a brief. After a PCRA petition and hearing, Oliver was granted leave to file this direct appeal *nunc pro tunc*. We now consider his appeal on the merits.

Oliver raises six issues on appeal: (1) the evidence properly admitted against him was insufficient to support his conviction; (2) use of his co-defendants' confessions violated his right to confront the witnesses against him; (3) his severance motion should have been granted, and his trial counsel's failure to specifically object constituted ineffective assistance of counsel; (4) trial counsel was ineffective for failing to object to the judge's use of the word "a" instead of "the" in a jury charge; (5) trial counsel was ineffective for failing to object to

4

a charge which referred to Oliver's silence after arrest; and (6) the jury held his silence against him.

The first three issues are inter-related, and to appreciate Oliver's argument requires a careful examination of the evidence presented in this case. We view all the evidence in the light most favorable to the Commonwealth as verdict winner. *Commonwealth v. Hughes*, 521 Pa. 423, 555 A.2d 1264, 1267 (1989). Oliver was tried jointly with three co-defendants: David Walker, Ronald Lynch, and Joseph Hess. The latter two defendants gave confessions to police upon arrest; Oliver and Walker maintained their silence and innocence. The Commonwealth relied on two primary sources in building its case against Oliver: the eyewitness testimony of David Smith, and the confessions of Lynch and Hess. Because Oliver's argument hinges on the admissibility of the confessions, it is crucial that we examine Smith's testimony separately from the narrative of the crime contained in the confessions. We have conducted a thorough review of the record, and our characterization of Smith's testimony differs somewhat from the Commonwealth's, and from the summary contained in Hess's appeal. *Cf. Commonwealth v. Hess*, 378 Pa.Super. 221, 224, 548 A.2d 582, 584 (1988).

David Smith first testified at Oliver's preliminary hearing. N.T. 3/7/85 pp. 52–81. Around 1:00 p.m. on January 21, 1985, Smith took the elevator up to his girlfriend's tenth-floor apartment in the projects at 1515 Hemberger Way, Philadelphia. This apartment is located in the center of the high-rise, near the elevator shaft; there is a stairwell about ten feet to the right and another stairwell ten feet to the left. Around 3:30 Smith heard some scuffling sounds outside and a single gunshot. Smith waited for a few seconds, and then poked his head outside the door. He saw a man running down the right stairwell and three men running up the left stairwell.[1] Smith

---

1. N.T. 3/7/85, p. 54. Smith was quite clear on this date that the three men were headed up the stairwell: "Q. How about any of the three men, were any or all of them in the hallway or had any or all of them gone through those double doors to the stairwell? A. They came through the double doors on the way up." *Id.*, p. 69.

went back into the apartment, collected his things, and set out to leave. On his way out of the building he noticed a trail of blood, which led him to the seventh floor. There he found David Green, known as the "Incense Man," lying in a pool of blood.[2] Smith told a girl at the scene to call the police; and when the officers arrived, Smith gave a statement in which he identified one of the men running up the stairwell as appellant Oliver.

About a year later, Smith testified at the joint trial of Oliver and his three co-defendants. N.T. 2/2/86, pp. 4–86. Here Smith described seeing the three men coming down the stairwell opposite the Incense Man; when the three saw Smith watching them, they turned and ran back up the steps.[3] Smith identified two of the three as co-defendants Oliver and Walker. *Id.* at p. 7. Smith also testified that later, when a crowd had gathered around the Incense Man's body, he heard Oliver ask an unidentified person, "What you going to do?" The unknown person replied, "I'm going home." *Id.* at p. 13.

Smith was extensively cross-examined by defense counsel at trial, who used Smith's testimony at the preliminary hearing to impeach Smith's current characterization that Oliver and two other co-defendants were "chasing" the Incense Man, albeit down a separate stairwell. N.T. 2/2/86, p. 23. Normally, we would not hesitate to conclude that the jury must have chosen to believe Smith's trial testimony, and that the jury could have reasonably found Oliver guilty of participating in a conspiracy to rob the Incense Man based upon this testimony. But this otherwise clear inference has been heavily clouded by the allegedly improper use of Oliver's co-defendants' confessions.

**2.** Green eked out a living by selling incense and body oils door to door in the projects, thus making him a prime robbery candidate. As David Smith later testified, "Who else they going to rob in the projects? Who else got some money but the Incense Man?" N.T. 2/2/86, p. 47.

**3.** N.T. 2/2/86, p. 7. We take care to keep the victim and the perpetrators on their respective stairwells. Even when taken in the light most favorable to the Commonwealth, the evidence nowhere suggests that the three co-defendants pursued the Incense Man down a single set of stairs. *Cf. Hess, supra,* 378 Pa.Super. at 224, 548 A.2d at 584.

6

Neither of Oliver's confessing co-defendants took the stand at trial, and their statements were read into evidence during the testimony of the arresting officers who took them. N.T. 1/31/86, pp. 88–99; 2/2/86, pp. 137–144. These statements described the entire conspiracy from start to finish in great detail: how the four defendants agreed to rob the Incense Man and carefully planned who would hold the gun, who would hold the Incense Man, and who would take his money; how they stalked the Incense Man from floor to floor, but when they moved in for the robbery and met unexpected resistance, one of them fired the gun; how, when they realized they'd killed the Incense Man, they coerced each others' silence with threats.

■■■ The confession testimony is certainly persuasive, but its admission raises profound questions under both the hearsay rule and the Confrontation Clause of the Sixth Amendment to the United States Constitution. We will first consider Oliver's constitutional claim, which guarantees him the right to face his accuser. The Sixth Amendment embodies a fundamental tenet of our criminal justice system—that an accused must be afforded the opportunity to cross-examine the witnesses against him. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Because Hess and Lynch never took the stand, Oliver had no opportunity to test the truth of their confessions with rigorous cross-examination. Accordingly, it would violate Oliver's constitutional rights for a jury to use these confessions in determining his guilt.

■■■ Perhaps the optimal solution to this problem would have been to sever Oliver's trial from his co-defendants' trials; that way, the confessions could have been properly admitted against their authors, but not against Oliver. But the potential prejudice to a defendant from the use of non-testifying co-conspirators' statements must be balanced against the demands of judicial economy and desire for verdict consistency. *See Commonwealth v. Wharton,* 530 Pa. 127, 142 and n. 5, 607 A.2d 710, 718 and n. 5 (1992) (citing *Richardson v. March,* 481 U.S. 200, 210, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987)).

We must therefore consider the extent to which Oliver may have been prejudiced by the use of Hess's and Lynch's confessions at his trial.

■ Until the late 1960s, courts routinely allowed the admission of non-testifying co-defendants' statements, and held that all prejudice could be cured by a simple limiting instruction that the jury only consider each confession against its author, and not the other co-defendants who were implicated by name. The U.S. Supreme Court declared this practice unconstitutional in *Bruton v. United States.*[4] The response has been to employ another fiction: redaction of co-defendants' statements so as to eliminate all references to an accused by name. This practice of substituting pronouns or "other person" for specific names has been approved by our courts. *See Commonwealth v. Johnson,* 474 Pa. 410, 378 A.2d 859 (1977). Redacting testimony is not a magic curative elixir, but still requires a court to balance the potential prejudice to the defendant against the probative value of the evidence, the possibility of minimizing prejudice, and the benefits to the criminal justice system of conducting joint trials. Redacted testimony may still violate the *Bruton* rule if it is "powerfully incriminating" and lends " 'substantial, perhaps critical weight' to the prosecution's case." *Commonwealth v. Rawls,* 276 Pa.Super. 89, 97, 419 A.2d 109, 113 (1980).

Our Supreme Court has recently underscored the importance of avoiding any return to pre-*Bruton* prejudice through unrealistic faith in the curative powers of redaction. In *Commonwealth v. Wharton,* the Pennsylvania Supreme Court rejected as "too facile" the rationalization that a jury couldn't positively know who "the other person" is in a redacted confession. *Wharton, supra,* 530 Pa. at 142, 607 A.2d at 718. There, as here, a jury could easily fill in the blanks in the redacted testimony and thus could not help but use the

4. 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). As Justice Brennan frankly put it: "The naive assumption that prejudicial effects can be overcome by instructions to the jury ... all practicing lawyers know to be unmitigated fiction...." *Id.* at 129, 88 S.Ct. at 128 (ellipses in original, citations omitted).

testimony in assessing defendant's guilt. But while acknowl-
edging a possible violation of the *Bruton* rule, the *Wharton*
Court held that any such violation was harmless in light of the
other overwhelming evidence of the defendant Wharton's
guilt. *Id.,* 607 A.2d at 718–19.

■ If we put aside Hess's and Lynch's confessions, and
consider all other properly admitted evidence against Oliver,
we note that it is far from overwhelming. David Smith's
testimony contained contradictions, and, depending upon
which version the jury believed, could provide only a thread-
bare evidentiary basis upon which to implicate Oliver in the
conspiracy. Following our Supreme Court's most recent and
authoritative application of the *Bruton* rule in *Wharton,* we
would hesitate to affirm Oliver's conviction solely upon this
evidence. With this in mind, we now turn to the question of
whether Hess's and Lynch's confessions could be properly
admitted under the co-conspirator exception to the hearsay
rule.

The confessions in *Bruton,* which the jury was instructed
not to use, would have been inadmissible as hearsay. The
*Bruton* Court reserved the question of whether the Confronta-
tion Clause might be satisfied when the confessions fall within
a traditional hearsay exception. *Bruton, supra,* 391 U.S. at
128, n. 3, 88 S.Ct. at 1624, n. 3. The U.S. Supreme Court later
held that testimony which falls into the co-conspirator excep-
tion to the hearsay rule, and has "strong indicia of reliability,"
may be introduced without the benefit of cross-examination.
*Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d
213 (1970); *accord Commonwealth v. Coccioletti,* 493 Pa. 103,
111, 425 A.2d 387, 391 (1981). We must therefore consider the
application of the co-conspirator exception to Hess's and
Lynch's confessions and their degree of reliability.

The admissibility of the confessions against their authors,
despite their apparent hearsay nature, was never an issue at
trial and is not before this Court. We note at the outset that

Lynch's confession is self-exculpatory[5] and, therefore, considerably suspect. Hess's statement is just the opposite: in his confession to the police, Hess admits his participation in the robbery, and even acknowledges being the one who shot the Incense Man. N.T. 1/31/86, pp. 90–97. The entire statement is thus strongly contrary to Hess's own penal interests, and may be considered reliable. *See Commonwealth v. Hackett*, 534 Pa. 210, 220, 627 A.2d 719, 724 (1993) (co-conspirators' statements found highly reliable when "made in each others' presence, in front of a third party who was not part of the conspiracy, and contrary to their own penal interests").

Most of Hess's confession is a narrative, given to a police officer well after the crime, and thus does not necessarily fall within the conspiracy exception to the hearsay rule. *See Commonwealth v. Lambert*, 529 Pa. 320, 334, 603 A.2d 568, 575 (1992) (conspiracy exception requires that statements be spoken by the co-conspirators during the conspiracy, and in furtherance of the common design). Our review of Hess's statement does reveal some testimony in which Hess relates what the other conspirators said during the course of the conspiracy, and which therefore may properly be considered against Oliver (although in the redacted version of Hess's testimony, Oliver was not named). Hess specifically recounts one of his fellow conspirators saying, "Let's go rob the Incense Man." N.T. 1/31/86, p. 90. When the group moved in for the robbery, one of them said to the Incense Man, "Where the money at?" *Id.* After the gun was fired, Hess asked one of his compatriots, "Did I shoot the man?" to which his cohort responded, "Yeah, you in the big time, you killed him." *Id.* at p. 97.

5. Lynch's statement is quoted at length in *Commonwealth v. Hess, supra*, 378 Pa.Super. at 224, 548 A.2d at 584. Lynch describes the planning and commission of the robbery, but insists that he refused to participate. In any event, the only parts of Lynch's confession which fall into the conspiracy exception add nothing to Hess's recounting of what was said by the conspirators: "They said they were going to rob the Incense Man. They asked me if I was down with them. I told them I'm not about that stuff." N.T. 2/2/86, p. 141; "He told me that I better not say anything.... He [ ] told me that if I tell on him he was going to get me the same way." *Id.* at p. 142.

We are now in a position to evaluate the evidence which was properly admitted against Oliver. Applying the conspiracy exception to Hess's statement, the jury might have concluded that Hess and some other people decided to rob the Incense Man, and ended up shooting and killing him. From David Smith's testimony, the jury might suspect that the three people coming up or down the stairs opposite the Incense Man were the people in Hess's narrative, and by Smith's identification, Oliver was one of these three. Had Smith also identified Hess as one of these three, we think no jury would hesitate to connect the two sources and find that Oliver was definitely proven to be a member of the conspiracy. Smith only managed to identify Oliver and Walker, though, and a jury which honestly followed the court's limiting instruction would have less of a basis for concluding that Oliver, Walker, and the third unidentified person were the same people referred to in Hess's testimony. The presence of these three on a different stairwell, but in the same area as the Incense Man, shortly after the shot was heard, is but circumstantial evidence of their involvement—little more than mere presence, in fact.

As we noted earlier, if we could reasonably infer from the record that the jury chose to believe David Smith's trial testimony (which described Oliver, Walker, and the third person as chasing the Incense Man), then we would hold that Oliver's verdict is sufficiently supported by properly admitted evidence. But we think that Smith's earlier testimony at the preliminary hearing (which described the three co-defendants as coming up one stairwell while the Incense Man went down another) would not be enough to sustain the verdict. We can infer from the record that the jury must have relied on the unconfrontable confession testimony of Oliver's co-defendants, at least some of which was improperly admitted. *See Rawls, supra* (the confessions were powerfully incriminating as to Oliver, and lent critical weight to the prosecution's case). Thus, while the properly admitted evidence could be enough to sustain a guilty verdict, we simply do not know what the jury would have done had it been presented only with Smith's rebutted eyewitness testimony and considered only that much

of the co-defendants' confessions which properly fell into the hearsay exception. In this case the independent evidence of guilt is so tenuous that we cannot consider the introduction of the entire confessions to be harmless error, redaction and limiting instructions notwithstanding. *Accord Wharton, supra.* Our obligation to view all evidence in the light most favorable to the Commonwealth cannot be extended so far as to allow us to put aside the bulk of the evidence because of its prejudicial effect, then search the record for some bit of inconclusive and impeached testimony, and use it to construct a hypothetical scenario in which the jury might have reached the same verdict. Rather, we must hold that Oliver was unfairly prejudiced by a violation of the *Bruton* rule, and deserves a new trial.

Because of our disposition of Oliver's first three claims of error, we need not address the remaining three.

Judgment of sentence vacated, and case remanded for a new trial. Jurisdiction relinquished.

JOHNSON, J., concurs in the result.