535 A.2d 1026

COMMONWEALTH of Pennsylvania, Appellee,

v.

James PEETROS and James Eden, Appellants.

Supreme Court of Pennsylvania.

Argued Oct. 22, 1986.

Decided Dec. 28, 1987.

James D. Crawford, Philadelphia, for appellants.

Dennis C. McAndrews, Wayne, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

ZAPPALA, Justice.

In this case the Appellants seek review of a Superior Court order which vacated the judgment of sentence entered by the Court of Common Pleas of Delaware County (McGovern, J.) pursuant to Appellants' convictions on the charges of bribery, corrupt organizations, criminal conspiracy to commit bribery, and criminal solicitation to commit bribery. Appellant Eden was also convicted of the charge

of prohibited offensive weapons. Appellant Peetros was sentenced to not less than three nor more than six years imprisonment on the bribery charge, and a consecutive sentence of not less than two nor more than six years on the corrupt organizations charge. Eden was sentenced to not less than two nor more than five years on the bribery charge, a concurrent sentence of not less than two nor more than five years on the corrupt organizations charge, and a consecutive sentence of not less than six months nor more than two years on the prohibited offensive weapons charge. Sentence was suspended as to both Appellants on the inchoate crimes.

The Superior Court, while dismissing most of Appellants' allegations of error in a memorandum opinion, did find merit in the Appellants' contention that their trial counsel was ineffective for failing to object to the trial judge's charge as to the elements of the crime of corrupt organizations, vacated the judgments of sentence, and remanded for an evidentiary hearing concerning counsel's reason for not objecting to the charge, *Commonwealth v. Peetros*, 343 Pa.Super. 615, 494 A.2d 484 (1985). We granted Appellants' petition for allocatur to address the other substantive allegations of error. For the reasons that follow, we vacate the order of the Superior Court, reverse Appellants' convictions on the charge of corrupt organizations, and grant Appellants a new trial as to the charges of bribery and related inchoate crimes.

This case is a very unsettling one. It had its genesis with the murder of Harry N. Peetros, brother of Appellant James Peetros, in Delaware County on May 23, 1981. Pursuant to the investigation of that murder, certain items were removed from the decedent's apartment by the Delaware County detectives. In conjunction with the Peetros murder, Officer Elefterios Mitsos of the Philadelphia Police Department was specially assigned to help Delaware County authorities in the investigation due to his familiarity with the Greek community in which the incident occurred and his

ability to communicate in the Greek language, which was predominantly spoken there. Officer Mitsos commenced his investigation by interviewing members of the community in the restaurant of an acquaintance, Peter Louvaris. Louvaris had been a close friend and associate of Harry Peetros and had also known Officer Mitsos for many years. Louvaris assisted Mitsos in the investigation of Harry Peetros's death by providing his restaurant as a place where Mitsos could interview witnesses in the community—witnesses whom Louvaris would help to identify and contact.

Sometime after the funeral of Harry Peetros, James Peetros paid a visit to Mr. Louvaris. Appellant was on furlough from Graterford Prison. He inquired of Louvaris whether Louvaris knew any of the Greeks who owed money to his brother, as he was attempting to collect the money owed for his sister-in-law (Harry's widow) and nephews. Louvaris indicated that Harry had carried a particular brown book and that he (Louvaris) probably knew the detective who "can help us, who will help me—because I know him for a long time—to get to the books". N.T., Oct. 13, 1982, pp. 109–110. Peetros indicated he would be very interested.[1] Louvaris communicated Peetros's interest in the loan records to Detective Mitsos. At some point, Mitsos indicated to Louvaris that the books of Harry Peetros were for sale. Later, he rephrased Mitsos's comment to the effect that, "He said that it was always a way you can get them, if it was for that kind of purpose, to help the widow and the kids". Oct. 14, 1982, p. 47. Louvaris indicated that shortly thereafter Mitsos gave him his telephone number, which he gave to Harry Peetros's widow and to James Peetros, and that that was the extent of his involvement.

---

1. It becomes important to note that while at one point it was alleged that Harry Peetros had been a "loan shark", the instant record is devoid of any proof of that fact or that Peetros planned to continue any "loansharking" operation. Indeed, the uncontradicted testimony is that Peetros was only interested in recovering the principal amounts of loans which had been made by his deceased brother and which were, to the extent that they were not proven to be usurious, legal debts owed to the estate.

Peetros, who was still imprisoned at Graterford, had a meeting with Detective Mitsos at the "Roundhouse" in Philadelphia.[2] Peetros was taken there to the Homicide Division on June 2nd or 3rd of 1981 for interrogation in conjunction with the murder of Harry Peetros. It was on this date, Officer Mitsos testified, that he and the Appellant first met. Peetros indicated to Mitsos that he was interested in collecting whatever was owed to his brother to help his sister-in-law and her children. Mitsos testified that Louvaris subsequently indicated to him in late June or early July that someone was interested in obtaining the books of Harry Peetros and "that he (Mitsos) could make himself a lot of money." Louvaris later indicated that the person interested was Peetros.

Sometime in early July, Peetros called Mitsos at the Roundhouse and stated, "Hey, buddy, how you doing? I heard you want to do business. Don't do anything until you hear from me on my next furlough." N.T. Oct. 14, 1982, p. 141. At this point, Mitsos indicated, he informed his immediate supervisors in Philadelphia and in Delaware County of the contact. The next meeting between Peetros and Mitsos occurred on July 24, 1979 at the Roundhouse. While both Peetros and Mitsos acknowledge that a meeting did take place, their testimony is contradictory as to the substance of that meeting. Peetros indicated that at the meeting he expressed anger at Mitsos for standing him up at a meeting scheduled for July 4, 1981 at Louvaris's restaurant, at which time an exchange of $10,000.00 for the books was to be made. Mitsos testified that the encounter was a chance one and that Peetros stated to him

"What's happening? I had to go downtown and get $10,000.00 up front. If you don't want to do business, let me know now, and I'll go another route."

I answered him that I didn't want to do any business at that time. I did not expect this meeting. I was unaware

2. This was the nickname given to the Police Administration Building at Eighth and Race Streets in Philadelphia, out of which Officer Mitsos was assigned.

that this was going to happen, and I shied away from him by telling him I didn't want to do any business.

N.T., Oct. 14, 1982, p. 143.

Both testified, however, that a disagreement arose at the July 24th meeting, and no further contact was had between them until an October 2nd telephone conversation, which was recorded. Mitsos testified that this conversation stemmed from a September 23rd meeting with Louvaris, at which time Mitsos stated to Louvaris:

"[T]he books were still in possession of C.I.D.; and that I had looked at them, and you wouldn't believe the names and figures in the books."

His [Louvaris's] exact words were, 'No shit, the guy, I believe, is still interested in it, and I'll get in touch with him.' "

*Id.* at p. 150. Louvaris indicated that he would have Peetros contact Mitsos. *Id.* Between October 2 and 14, 1981, Mitsos had a series of telephone conversations with Peetros while Peetros was in Graterford Prison. These conversations were recorded pursuant to a consent signed by Mitsos, and the substance of the transcripts detail the negotiation and procedure for exchanging the books in question for $10,000.00. During these conversations, it was agreed that $5,000.00 would be paid at the time of the transfer, and $5,000.00 at a later date. It was also agreed that because Peetros was still in prison, the exchange would take place between Mitsos and James Eden.

On October 15, 1981, Eden and Mitsos met in a parking lot and made the negotiated exchange. The arrangements had been made the previous night pursuant to a telephone conversation between Eden and Mitsos, which was also recorded. The actual transaction on October 15, 1981 and the subsequent arrest of Eden was videotaped and made part of the record. Subsequently, Peetros was arrested, and sometime later, Louvaris was also arrested. Louvaris pled guilty to conspiracy pursuant to a plea bargain and testified on behalf of the Commonwealth at Appellants' trial. Appellants were convicted and appealed to the Supe-

rior Court, which vacated the convictions subject to the remand on the question of ineffectiveness. This appeal follows our grant of allocatur.

Appellants raise five allegations addressed to the sufficiency of the evidence, improper rearrest, prosecutorial misconduct, and the denial of their Sixth Amendment right to confront Mitsos on cross-examination as to his previous disciplinary action concerning bribes which led to his subsequent demotion by the Philadelphia Police Department. Because of our disposition of the case, we need only address the issues of sufficiency of the evidence, improper rearrest, and the denial of the Sixth Amendment right; however, because of our grant of a new trial, we shall also address Appellants' allegations of prosecutorial misconduct.

## I. Sufficiency of the Evidence

### A. Bribery.

◼ Appellants allege that the convictions for bribery and companion inchoate convictions should be reversed because the Commonwealth failed to prove that the benefit conferred upon Mitsos was consideration for a violation of a *known* legal duty, an element of the offense under § 4701(a)(3) of the Crimes Code.[3]

This argument merits scrutiny in light of the fact that the prosecution failed to establish that the items sought to be obtained from Mitsos were anything more than personal effects of a murder victim which, absent any proof of illegality, evidentiary need, or contraband, are generally returnable to the estate of the deceased. *See* Pa.R.Crim.P. 323. As such, the police would ordinarily have a "duty" to *return* those items rather than to retain or destroy them.

---

3. 18 Pa.C.S. § 4701. **Bribery in official and political matters.**

    **(a). Offenses defined.**—A person is guilty of bribery, a felony of the third degree, if he offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:

    **(3).** any benefit as consideration for a violation of a known legal duty as public servant or party official.

To prove a violation of § 4701(a)(3), the Commonwealth was obliged to introduce the documents in question and prove that they were indeed what the Commonwealth *alleged* them to be, thereby demonstrating their illegality and the corresponding duty to retain them. This burden could not be met, however, by simply making repetitious allegations as to the character of the books without any substantive proof. Notwithstanding the Commonwealth's vehement contentions to the contrary, this was not done and raises serious doubt as to the proof of the duty element as required by the statute.[4]

Unfortunately for Appellants, however, while the thrust of the prosecution's case and the trial court's opinion were directed solely toward a violation of § 4701(a)(3), a review of the information filed against Appellants reveals that they were charged with a violation of § 4701 generally. Appellants have not alleged error in that regard, and thus any contention to that effect here is waived. The Commonwealth, on the other hand, has argued as an alternative ground for a finding of sufficiency that Appellants violated § 4701(a)(1), which provides:

> ... A person is guilty of bribery, a felony of the third degree, if he offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:

> (1) any pecuniary benefit as consideration for the decision, opinion, recommendation, vote *or other exer-*

---

4. It is interesting to note that subsequent to the instant convictions, a suit was brought on behalf of the Estate of Harry N. Peetros against the Delaware County District Attorney's Office and the County Detectives seeking to have the books returned to the estate. The Common Pleas Court granted the estate's motion and ordered the books returned to the estate, Delaware County, Criminal Division, at No. Misc. Docket A–37, P. 370 of 1983 (Keiler, J). On appeal, the Superior Court reversed, finding that the Commonwealth had sustained its burden of showing that the books were "derivative contraband" by a preponderance of the evidence and therefore subject to forfeiture. *Estate of Peetros v. County Detectives*, 341 Pa.Super. 558, 492 A.2d 6 (1985). No such attempt to show the illegality was made by the Commonwealth in the instant case, however.

*cise of discretion* as a public servant, party official or voter by the recipient....

18 P.S. § 4701(a)(1) (emphasis added).

After a thorough review of the record and testimony in this matter, there appears sufficient evidence which, if believed by the jury, would sustain a conviction of bribery under § 4701(a)(1). If one accepts the premise that the police department was at least able, if not obligated, to return the personal effects of the decedent to his estate, it would be a violation of subsection (a)(1) to seek or accept pecuniary benefit for doing so.

## B. Corrupt Organizations.

■ Appellants next contend that the evidence was insufficient to convict them of the charge of corrupt organizations. 18 Pa.C.S. § 911. We agree.

Initially, the Appellee argues that this issue was waived on appeal for Appellants' failure to brief and argue the point on post-verdict motions and before the Superior Court. This argument must fail. A review of the post-verdict motions, as well as the opinion of the trial court and the memorandum of the Superior Court, indicates that the issue was raised and addressed sufficiently below and is therefore properly before us now.

In order to be convicted of corrupt organizations, 18 Pa.C.S. § 911, as charged, the Commonwealth must prove beyond a reasonable doubt that the Appellants had violated the provisions of § 911(b)(2) or (3). Section 911(b)(2) provides that:

It shall be unlawful for any person through a pattern of racketeering activity to acquire or maintain, directly or indirectly, any interest in or control of any enterprise.

Subsection (3) provides:

It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

As Appellee correctly points out, the relevant definitions are found at § 911(h)(4) and (1). Section 911(h)(4), "Pattern of racketeering activity", refers to a course of conduct requiring *two* or more acts of racketeering activity, one of which occurred after the effective date of the section. (Emphasis added). Section 911(h)(1) defines *racketeering activity* as:

(i) any act which is indictable under any of the following provisions of this title:

.  .  .  .  .

**Chapter 47** (relating to bribery and corrupt influence).

.  .  .  .  .

and

(iii) any conspiracy to commit [bribery] ...; or

(iv) the collection of any money or other property in full or partial satisfaction of a debt which arose as the result of the lending of money or other property at a rate of interest exceeding 25% per annum or the equivalent rate for a longer or shorter period, where not otherwise authorized by law.

Under the Commonwealth's theory, a pattern of racketeering activity was established by virtue of the fact that Appellants tried on *numerous* occasions to bribe Mitsos and that an alleged attempt to collect money, as testified to by Commonwealth witness Soublis, constituted an act attempting to collect a debt, the interest of which was far in excess of the twenty-five percent per annum.

Appellants' convictions on these charges must be overturned, however, because we find only one act to have been established. First, Appellee's theory that the plan for bribing Mitsos constituted multiple acts of bribery is unfounded. The evidence introduced by the Commonwealth to show the attempted bribery of Mitsos consisted of testimony of meetings and the introduction of various tape recordings and a videotape. Viewing this evidence in the light most favorable to the Commonwealth, we can only conclude that it represents a continuous course of conduct leading up to

only *one* act of bribery. Therefore, a pattern of racketeering based only upon multiple acts of bribery cannot stand.

In addition, however, the Commonwealth presented evidence, and here argues, that an attempt by Appellants to collect money from Soublis constituted evidence of the collection of a debt which was (a) illegal, and (b) at a rate greater than twenty-five percent per annum or the equivalent rate for a longer or shorter period. Viewing it in the light most favorable to the Commonwealth, the evidence fails to support this contention. While there was some testimony from Soublis as to a debt that was owed to Peetros's deceased brother, there is nothing in the record that indicates that this debt was either the same as that to be collected or was the result of the lending of money at an usurious rate. While the Commonwealth makes much in its brief of the "whopping fifty-two percent interest" rate paid by Soublis, we do not view the testimony of Soublis as establishing an illegal loan or high interest rate. Soublis testified that he borrowed initially $5,000.00 from the deceased, then stated:

> ... I paid him [Harry Peetros], and I borrowed, again, $5,000.00.
>
> **Q.** How much interest would you pay him per week? What would you pay him per week?
>
> **A.** *I give him every week $250.00:* $50.00 for the interest, and $200.00 against the loan.
>
> **Q.** *How long did he take to pay off the $5,000.00 loan?*
>
> **A.** *Approximately 20 weeks.* I have written everything in this book here.

N.T., Oct. 13, 1982, p. 84. (Emphasis added).

First, we do not view this evidence as establishing an *illegal* debt owed to Peetros's *decedent.* It is clear that Soublis borrowed $5,000.00, repaid it at a rate of $250.00 per week, and that it took him approximately twenty weeks to make the repayment. His direct testimony, therefore, indicates only that $250.00 was paid per week over an approximately twenty-week period, and this amount equals the amount which was borrowed. The Commonwealth's

contention that the simple arithmetic of (principal) × (rate) × (time) should lead us to a different conclusion is simply not substantiated by the ambiguousness of the testimony. Nor did Soublis' testimony establish the 52 percent rate alleged by the Commonwealth since, even though he characterizes fifty dollars per week as "interest", this is not consistent with the twenty-week payoff of the $5,000.00 debt to which he testified. Therefore, that testimony is, at best, inconclusive and cannot support a reasonable inference that the loan carried a 52 percent interest rate. More importantly, however, Soublis's testimony as to Appellants visiting him to discuss a debt and, further, Eden's subsequent visit and the resultant discrepancy in the amount owed no more establishes an attempt to collect an illegal debt given by the deceased than it does a misunderstanding as to *some* "debt" which was owed. Further, nowhere is the debt testified to and the debt allegedly attempted to be collected identified as one and the same. On this basis, we must agree with Appellants' assertion that the Commonwealth has failed to sufficiently establish that the Appellants were in violation of 18 Pa.C.S. § 911(h)(1)(iv) since, at best, the Commonwealth has established only one instance of misconduct under that act, which is insufficient to establish a pattern of racketeering activity. We must therefore reverse Appellants' convictions on the charge of corrupt organizations.

## II. Impeachment of Prosecution Witness As to Disciplinary Action

■ Appellants next contend that their Sixth Amendment right to confrontation was denied when the trial court disallowed their request to impeach Mitsos through the use of a prior disciplinary action against him by the Philadelphia Police Department resulting in his demotion from detective to patrolman. Appellants' attorney made an offer of proof on two occasions, once at sidebar and once in chambers, requesting permission to support his contention that the action against Mitsos was based upon his having accepted bribes in 1975, 1976, and years prior. He also made avail-

able a witness, Thomas Schultz, who had testified at the disciplinary hearing that he had paid bribes to Mitsos and other officers. The trial court denied this questioning on the basis that the disciplinary actions against Mitsos had not amounted to a conviction. (Trial court opinion at 14.) For the reasons stated below, we reverse.

To decide this issue, we must balance the Appellants' Sixth Amendment right to confront witnesses against the prejudice and detriment of allowing this type of questioning. Appellants rely upon the United States Supreme Court case of *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), to support their contention that cross-examination of prosecutorial witnesses be construed broadly in order to permit the defendant to delve into the witness's story and test his perceptions and memory, but, more importantly, to allow the cross-examiner to discredit or impeach the witness. *Id.* at 316, 94 S.Ct. at 1110. In Pennsylvania, the rule has generally been that unless a prior bad act results in a conviction, it cannot be used to impeach a witness. *Commonwealth v. Katchmer*, 453 Pa. 461, 309 A.2d 591 (1973). The rationale behind this rule is to prevent the "smearing rather than merely discrediting of the witness". *Id.*, 453 Pa. at 464, 309 A.2d at 593.

The case before us, however, presents a situation which lies somewhere in the gray area between mere allegation and actual conviction and is one of first impression in this jurisdiction.

While the witness here has not been convicted of the crime of bribery, there is present in the offer of proof evidence that he was subject to a disciplinary proceeding which resulted in his demotion, purportedly on the basis of the testimony of the subpoenaed witness, who stated that he had on several occasions bribed detectives, including Mitsos.

We must determine whether the circumstances here—the witness's testimony directly reflects upon the charges against, and the defense asserted by, the Appellants, and the disciplinary proceeding offers more reliability than a

mere allegation or arrest of an individual for a crime—affects the balance struck by our traditional rule.

The administrative proceeding conducted by the Philadelphia Police Department, being an orderly, factfinding proceeding, has some of the indicia of reliability attributable to an adjudicatory body. While the burden of proof may be lighter, the proceeding is adversarial, and there is a strong interest on the part of an officer to defend himself. We can therefore safely assume that its findings of fact and subsequent action with regard to a matter are indeed more credible than the mere allegation or arrest of an individual.

The essence of Appellants' defense was duress and/or entrapment. It is clear that the necessity existed to discredit Mitsos as to his story that the bribery attempt was conceived by Appellants alone. Had the proffered testimony been introduced, it would have cast a shadow on the credibility of Mitsos by bolstering Peetros's contention that the idea behind payment for the books was Mitsos's alone until the deal went sour late in July of 1981, when he (Mitsos) then threatened that if Peetros didn't buy the books, he would sell them to another.

**Q.** Did you see Mitsos?

**A.** [Peetros]: It was at Mr. Louvaris's restaurant that he gave the message Mr. Mitsos wanted to see me a couple days after I told him I didn't want to have anything to do with it anymore. And I asked Mr. Louvaris to contact Mr. Mitsos at home. I believe it was a Sunday.

And he reached him on the phone, and he handed me the instrument. And Lefty said, "I want to meet with you; it's very important." I said, "Well, I only got a couple more days." He says, "How about where you're at?" I says, "What time?" He said, "12:00 midnight." I said, "I'll be here."

**Q.** Did he come?

**A.** He showed up.

**Q.** What did you and he discuss?

**A.** We went in the back, sat at the table. At that time, he says to me, "Listen. Do you know Joe Cadillac?" I said, "Yes, I know a Joe Cadillac. Is his correct name Joe Carey?" He said, "No, no." I said, "Is this fellow from Center City?" He said, "No. I'm talking about someone from Delaware County, someone who owes your brother like $50,000; Joseph Landmeister." I said, "I don't know the man." He said, "Well, I've got an offer from him." I said, "Well, why don't you sell it to him?" He says, "Look, Jim. We made a deal. You're going to buy these books because if you don't buy them," he said, "I'm going to sell them to the highest bidder." And he said, "And, furthermore, all this extra assistance that you're looking for from our department, specifically Dan Rosenstein and our boss, the captain, to help you get out to a center, to go on parole, early parole, you can forget about that. "Jim," he said, "when you get out, you'll be an old man. You're an old man now, but you'll think a ton of bricks fell on you. You'll never see daylight."

**Q.** Did he say anything else?

**A.** Well, I said, "This is entrapment, my friend." He said, "Oh, yes. So what? Who's going to believe you?"

**Q.** Jimmy, why did he ever say to you, if this other man, Landmeister—whatever his name was—why didn't he sell the books to him?

**A.** I have no idea why he didn't.

**Q.** Did he ever give you any indication that what happened to any deals that he might have had with Landmeister?

**A.** No. No, he didn't specifically say anything about any deals.

**Q.** So he told you what when you told him this was entrapment? What did he tell you?

**A.** He says, "That's right." He said, "I'll have you locked up for bribery." He says, "You'll be in for what would be considered the rest of your life."

**Q.** What did you say?

**A.** I told him it was entrapment, and that's—he says to me, "Well, you're going to buy these books. You ain't got the money, you'll get it someplace." He says, "If you haven't got the money, get it from Pete Louvaris." He says, "He's been getting some money left here from some of those customers that we've talked about."

**Q.** Now, after this conversation, what was your state of mind? What did you think?

**A.** I didn't know what to think. I was very upset and very concerned because I had discussed with Mr. Mitsos at an earlier meeting, I believe at that Roundhouse, about the legality of what I was doing. And he said, "Oh, you don't have to worry. These books ain't evidence." He said, "They actually belong to Helen Peetros," he said, "but I'm going to keep them out because they're worth a lot of money." And he said, "I don't want to see them get in the wrong hands."

N.T., Oct. 15, 1982, pp. 156–159.

Balancing these factors, we must conclude that defendants' right under the Sixth Amendment of the United States Constitution to fully cross-examine this prosecution witness, and their need to do so, outweighs the possible diminution of evidentiary value to which a disciplinary proceeding might be subject. This is especially true because the subject matter sought to be explored directly relates to the heart of the allegations being made against the defendant. To allow otherwise would permit the accuser to be shielded from having the jury hear evidence of his prior willing participation in the very crimes he now attempts to place upon Appellants. Such would place too great a restraint upon the search for truth.[5] Subject to proper presentation,

5. It should be noted that our holding today is consistent with and adds symmetry to the "need to fully expose witnesses to the view of the jury" rationale which prompted enlargement in scope of the prior conviction impeachment rule as it relates to defendants and applied by a majority of this Court in *Commonwealth v. Randall,* 515 Pa. 410, 528 A.2d 1326 (1987).

the trial court should have granted Appellants' request to discredit Mitsos by means of his prior disciplinary action. We therefore order a new trial for Appellants.

As to Appellants' contentions that it was error to deny them the right to cross-examine Mitsos as to whether he had ever taken a bribe or to rebut a negative response, these must fail. Our review of the record reveals that Appellants' attorney made such a request in chambers, and the judge properly refused to rule on the request until the question was asked. It never was, and therefore this issue was not preserved.

We also reject Appellants' contention that it was error to allow their rearrest and preliminary hearing to occur before a second issuing authority after the first had dismissed the bribery and weapons charges. After full review of the record, trial court opinion and briefs of the parties, it is clear that the trial judge properly disposed of this issue pursuant to Pa.R.Crim.P. 23.

Judgment of sentence reversed and new trial granted.[6]

NIX, C.J., and LARSEN, J., concur in the result.

HUTCHINSON, Former J., did not participate in the decision of this case.

6. Since a retrial in this matter has been ordered, we feel it necessary to address the propriety of the Commonwealth's repeated references to "loansharking or loansharking books". It is incumbent upon the prosecution as well as the trial court to refrain from any reference to "loansharking" or "loansharking books" unless there is introduced some substantive proof of either the commission of such crime or the illegality of the objects identified. Unless this rule is adhered to, these remarks, as the Appellants claim in their brief, are highly prejudicial to their case and will again result in a retrial and/or discharge on appeal. The prosecutor must understand that he cannot "have his cake and eat it, too." If he chooses not to introduce direct evidence of the books confiscated from the decedent, a strategy which he is certainly free to pursue, he cannot, at that point characterize that evidence as a proven fact when in reality no substantive proof has been introduced.