615 A.2d 1322

**COMMONWEALTH of Pennsylvania**

v.

**Clarence JOHNSON, Appellant.**

**COMMONWEALTH of Pennsylvania**

v.

**Joseph D'AMATO, Appellant.**

Superior Court of Pennsylvania.

Argued June 23, 1992.

Filed Oct. 22, 1992.

628

630

632

Mitchell S. Strutin, Philadelphia, for appellant in 1063.

Edward Rudley, Philadelphia, for appellant in 1111.

Ann C. Lebowitz, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before JOHNSON, FORD ELLIOTT, and HOFFMAN, JJ.

HOFFMAN, Judge:

These are consolidated appeals from judgments of sentence for first degree murder and related offenses. Appellants, Joseph D'Amato ("D'Amato") and Clarence Johnson ("Johnson"), present the following claims:[1]

I. Was the instant prosecution of defendant D'Amato barred by a prior agreement or grant of immunity in other unrelated cases; by the double jeopardy clauses of the United States and Pennsylvania Constitutions and 18 Pa.C.S.A. § 110?

II. Was the instant prosecution barred by the applicable statute of limitations?

III. Was counsel for defendant Johnson ineffective for failing to preserve a sufficiency of the evidence claim?

IV. Were statements of the coconspirators properly admitted through the testimony of Commonwealth witnesses Terri Harris, Lt. Kalmar and Steven Moore?

V. Was testimony improperly introduced by the Commonwealth and improperly excluded when offered by the defense?

VI. Were defendants denied their right to confront witnesses through appropriate cross-examination?

VII. Did the trial court commit an abuse of discretion in permitting the introduction of demonstrative evidence, including photographs and a weapon, or in allowing the prosecutor, in a complicated case to use and refer to a photograph display and was evidence of threats made to a Commonwealth witness properly allowed?

VIII. Was there prosecutorial misconduct during the trial?

IX. Was there judicial misconduct during the trial?

X. Did the lower court err in refusing to grant a defense request for severance?

XI. Did the lower court err when it denied defendant Johnson's motion to suppress an identification and was he

1. Many of the appellants' claims overlap and so, where possible, we have attempted to organize and combine appellants' claims according to the nature of the issue.

entitled to a cautionary instruction under *Commonwealth v. Kloiber?*

XII. Were the defendants entitled to an accomplice charge as to the testimony of Terri Harris?

XIII. Were the defendants entitled to appellate relief based on cumulative error?

D'Amato Brief at 3 and Johnson Brief at 3. For the following reasons, we affirm.

On September 29, 1988, D'Amato and Johnson were arrested and each was charged with first degree murder,[2] criminal conspiracy,[3] possession of an instrument of crime (PIC)[4] and corrupt organizations.[5] D'Amato successfully moved to quash the information charging him with corrupt organizations. The remaining charges were not affected by this ruling.

Following a trial from May 7 to May 30, 1990, the jury returned guilty verdicts on first degree murder and conspiracy as to both appellants.[6] Johnson was further convicted of corrupt organizations.[7] The court sentenced both appellants to life imprisonment on the murder charges. In addition, D'Amato received a concurrent sentence of five-to-ten years for criminal conspiracy and Johnson received a concurrent sentence of five-to-ten years for corrupt organizations and a consecutive sentence of five-to-ten years for criminal conspiracy. Post-verdict motions were filed on behalf of both appellants and denied on March 22, 1991. This timely consolidated appeal followed.

The trial court made the following findings of fact:

The victim, John Philson, worked as a doorman/lookout at 1649 Federal Street; an illegal lottery house known as the Greenhouse. This establishment was owned by the defendant, Joseph D'Amato, who suspected Mr. Philson of being

**2.** 18 Pa.C.S.A. § 2502.

**3.** 18 Pa.C.S.A. § 903.

**4.** 18 Pa.C.S.A. § 907.

**5.** 18 Pa.C.S.A. § 911.

**6.** A third co-defendant, Steven Williams, was tried with D'Amato and Johnson. However, he failed to file a timely appeal.

**7.** The PIC charges were *nol prossed* as to all defendants.

involved in a robbery of the Greenhouse.[8] Consequently, D'Amato hired co-defendant, Clarence Johnson, to kill John Philson. Clarence Johnson, in turn, hired co-defendant, Steven Williams and one, Leroy Clacks to kill Mr. Philson.[9]

Ironically, Mr. Philson, had taken an interest in Leroy Clacks' girlfriend, Terri Harris, around the same time as this contract was placed on his life. Consequently, on the evening of October 30, 1980, Leroy Clacks beat Terri Harris for allegedly sleeping with the victim. Leroy then told Terri to get John and bring him to the 1800 block of West Earp Street to talk about this matter or else he would beat her again. Ms. Harris acquiesced, and returned with John driving his car. Upon arriving they sat and talked for about 10 minutes before Leroy Clacks approached John's side of the car and they began to talk. Almost instantaneously the defendant, Steven Williams, appeared at the passenger side of the vehicle and told Terri to get out of the car. After she refused, Steven slapped and pulled her out of the car. Steven then pointed a gun at Terri while pushing her and telling her to run. Before Terri ran she noticed the weapon as one she had seen Steven obtain from co-defendants, D'Amato and Johnson. As Terri ran crying she heard shots ring out. She began screaming and ran home.

The police responded promptly at approximately 1:00 a.m. on October 31. Halloween morning reflected a real life horror: the shooting death of John Philson. The decedent was found sitting in the driver's seat of his car with 3

---

**8.** The initial information regarding this case was obtained from an undercover investigation into alleged police corruption. Based on these allegations, police officer Andrew Kalmar infiltrated this illegal lottery organization operated by Joseph D'Amato and—using a recording device—taped several phone conversations with D'Amato. During these exchanges D'Amato spoke of having John Philson murdered and of other killings in retaliation for disruption of the illegal lottery operations.

**9.** Terri Harris testified that she was left in a car when Leroy Clacks and Steven Williams met with Clarence Johnson and Joseph D'Amato in a candy store. After the meeting, Clacks and Williams returned with two handguns, drugs and a large sum of money. This meeting took place about a month before the shooting death of John Philson.

gunshot wounds to the head. The auto was *idling in gear* and John had collapsed with his foot on the brake.

Later that morning, Clacks and Williams went to Terri Harris' apartment. Clacks [10]—stained with blood—and Williams told Terri . . . that the shooting was in retaliation for John's role in a robbery of the Greenhouse.

Opinion, November 7, 1991, Sabo, J. at 2–4.

## I.

D'Amato first contends that his prosecution was violative of a prosecutorial agreement, a prior grant of immunity, the double jeopardy clauses of both the United States and the Pennsylvania Constitutions, and 18 Pa.C.S.A. § 110. These claims are meritless.

D'Amato was initially charged with murder, conspiracy to commit murder, conspiracy to commit corrupt organizations, PIC and corrupt organizations. Before trial, he moved to quash these charges based on his prior agreement to cooperate with the Commonwealth in exchange for immunity. Pursuant to that agreement he plead guilty to fourteen counts of bribery and one count of conspiracy, which charges related to the bribery of Philadelphia police officers. The Commonwealth agreed not to charge him with corrupt organizations and to grant him "use immunity." [11] After hearing testimony and argument on the motion to quash, the lower court granted the motion only as it pertained to the charge of corrupt organizations.

D'Amato now asserts that the instant prosecution for murder, conspiracy to commit murder and conspiracy to commit corrupt organizations violated the prior agreement. We disagree.

At the hearing on the motion to quash, D'Amato's own attorney who had earlier represented him in the bribery case,

10. Leroy Clacks was thereafter killed in December of 1980 in retaliation for John Philson's death.

11. The Commonwealth's request for "use immunity" was ultimately granted pursuant to 42 Pa.C.S.A. § 5947.

specifically acknowledged that the Commonwealth never agreed to forego a homicide prosecution. N.T., Motion to Quash, 6/12/89 at 32. Hence, any claim that the instant murder prosecution is barred by the agreement not to prosecute is meritless. Similarly, the charges of conspiracy to commit murder and conspiracy to commit corrupt organizations are not barred by the earlier agreement because the agreement only stated that D'Amato would not be prosecuted on corrupt organizations charges.

■ Nevertheless, D'Amato urges that even if his prior agreement with the Commonwealth did not bar the current charges, his prior grant of immunity did. Specifically, D'Amato contends that immunized testimony was used against him in the instant case. Again, we disagree. The tapes were made by Lt. Kalmar in an undercover capacity between 1984 and 1985. On these tapes D'Amato discusses his involvement in murder and racketeering. These tapes were made before the promise of immunity and were not contemplated by such a promise. The immunity agreement stated that in return for D'Amato's testimony,

> (a) Jake D'Amato agrees to be fully debriefed concerning his knowledge of, and participation in, the bribery of police officers and any other crimes about which he has knowledge. He further agrees to fully cooperate in the ongoing investigation of corruption in the Philadelphia Police Department. If Jake D'Amato provides truthful, complete and accurate testimony or information regarding bribery of police and police corruption, such testimony or information shall not be used against him in any other criminal proceeding.

Immunity Agreement, June 16, 1986, Record at 11. This agreement contemplated immunity as to any testimony or information gathered *after* the grant of immunity. This agreement did not contemplate immunity as to information that that was previously developed, such as the tapes. Consequently, we find that the Commonwealth's use of the tapes did not breach the promise of "use immunity," and thus, the current prosecution is not barred by any such immunity.

D'Amato also claims that the bills of information charging homicide and conspiracy to commit murder should have been quashed because the instant prosecution was in violation of state and federal double jeopardy protection and violates 18 Pa.C.S.A. § 110, Pennsylvania's compulsory joinder rule. We disagree.

There is an exception to the double jeopardy rule which allows for successive prosecutions where additional facts necessary to sustain the subsequent charges had not been discovered at the time of the initial criminal proceedings. *Grady v. Corbin,* 495 U.S. 508, 515, 110 S.Ct. 2084, 2090 n. 7, 109 L.Ed.2d 548 (1990). In the instant case, when D'Amato was then granted immunity as to the bribery and police corruption investigation, police had not been able to ascertain the identity of the murder victim D'Amato referred to on the tape recordings. N.T., Motion to Quash, June 12, 1988 at 9, 19–20. Obviously, without this most basic information about the crime, the Commonwealth could not have initiated a homicide prosecution. Consequently, D'Amato is not entitled to relief on grounds of double jeopardy.

Nor is D'Amato entitled to relief under Pennsylvania's compulsory joinder rule, 18 Pa.C.S.A. § 110. Joinder is mandated under this statute where the offenses both arose from the "same criminal episode" and "were known to the appropriate prosecuting officer." *Id.* Neither of these statutory prerequisites is met in the instant case. D'Amato's argument overlooks the fact that the prior bribery charges arose from an independent grand jury investigation and resulted in the filing of distinct criminal charges unrelated to the homicide. Moreover, while the murder occurred on October 11, 1980, the bribery and other matters covered by the prior plea agreement concerned incidents occurring in 1981 and later. N.T., Motion to Quash, June 12, 1988 at 41–42. Thus, the murder and previous bribery charge did not arise from the "same criminal episode." In addition, because the underlying facts of the murder were not sufficiently known to the police when the earlier bribery charges were lodged against D'Amato, the Commonwealth was not required to join the two sets of

criminal charges in what would have been a premature homicide prosecution. *See Commonwealth v. Kysor*, 334 Pa.Super. 89, 93, 482 A.2d 1095, 1097 (1984) (prosecutor need not initiate murder charges merely to satisfy joinder rule where additional investigation is required on homicide aspect of case). Accordingly, D'Amato is not entitled to relief under 18 Pa.C.S.A. § 110.

## II.

D'Amato and Johnson contend that their convictions on the charges of conspiracy to commit murder and conspiracy to commit corrupt organizations were barred by the applicable statute of limitations.[12]

In 1982, the legislature lengthened to five years the limitations period for conspiracy to commit corrupt organizations and in 1984, it eliminated the limitations period for criminal conspiracy to commit murder. *See* 42 Pa.C.S.A. §§ 5551 and 5552(b)(3). For purposes of the statute of limitations, the crime of conspiracy is a continuing offense. *Commonwealth v. Volk*, 298 Pa.Super. 294, 305, 444 A.2d 1182, 1187 (1982). Where the conspiracy is renewed by repetition, prosecution may be commenced within the limitations period as calculated from the last date of the offense. *Id.*, 298 Pa.Super. at 305, 444 A.2d at 1187.

As to D'Amato we find that the prosecutions were not time barred. Evidence exists as to both conspiracies as late as April 1985, when D'Amato, in taped statements to Officer Kalmar, spoke of his continued conduct in operating numbers houses and of his "marriage" to Clarence Johnson.[13] N.T., Volume II, May 11, 1990 at 64–68. Consequently, we find that the ongoing nature of the cover-up and D'Amato's ongoing

---

**12.** Both appellants concede that there is no statute of limitations for murder and that the murder charges were not time barred. *See* 42 Pa.C.S.A. § 5551.

**13.** Lt. Kalmar explained at trial that when D'Amato claimed to be "married" to Johnson, he was referring to the fact that Johnson had done a "job" (killed someone) for him, and once someone does a "job" for you, you must make payments or you will be exposed.

role in the illegal lottery organization tolled the statute of limitations for the conspiracy charges in 1985. In 1985 the statute of limitations for conspiracy to commit corrupt organizations was five years, hence when D'Amato was charged in 1988, the prosecution was not time barred. In 1985 the statute of limitations for conspiracy to commit murder was zero, thus when D'Amato was charged in 1988, the prosecution was not time barred.

As to Johnson, we find that the instant prosecutions were not time barred. Evidence exists as to both conspiracies as late as April 1985. In the taped conversations between D'Amato and Lt. Kalmar, references were made to Johnson's continuing role in the murder cover-up and in D'Amato's lottery houses. N.T., Volume II, May 11, 1990 at 64–68. Consequently, we find that the statutes of limitations for both conspiracies were tolled in 1985 and thus, the prosecution of Johnson in 1988 was not time barred.

## III.

Appellant Johnson, next claims that his trial counsel was ineffective for failing to preserve a sufficiency of the evidence claim. Specifically, he claims that the evidence was insufficient to convict him of any offense. This claim is meritless.

Initially, we note that counsel is presumed to be effective and the burden of demonstrating ineffectiveness rests on appellant. *Commonwealth v. Pierce*, 515 Pa. 153, 159, 527 A.2d 973, 975 (1987). To prevail on a claim of ineffectiveness, appellant must show that his underlying contention possesses arguable merit, that the course chosen by counsel had no reasonable basis designed to serve his interests and that counsel's conduct prejudiced him. *Commonwealth v. Davis*, 518 Pa. 77, 83, 541 A.2d 315, 318 (1988).

The test for reviewing a sufficiency claim is well-settled: [W]hether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner and drawing all proper inferences favorable to the Commonwealth, the jury could reasonably have determined all elements of the crime

to have been established beyond a reasonable doubt.... This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt....

*Commonwealth v. Hardcastle*, 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988) (citations omitted), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1169, 107 L.Ed.2d 1072 (1990)

 The evidence, viewed in the light most favorable to the Commonwealth, establishes that Johnson worked for D'Amato, provided protection for D'Amato's lottery houses, arranged to have the victim killed because he was suspected of setting up a robbery at the Greenhouse, and gave guns, drugs and money to Leroy Clacks and Steven Williams to commit the murder. These facts were established through D'Amato's taped conversations with Lt. Kalmar and through the trial testimony of Gene Swain, Terri Harris, Steven Moore and Jonathan White. N.T., Volume II, May 11, 1990 at 64–69; N.T., Volume III, May 14, 1990 at 15–18, 156–67, 175; N.T., Volume IV, May 15, 1990 at 83–84, 99–100. The evidence clearly was sufficient to find that appellant had conspired with D'Amato to kill Philson and that he was also involved in D'Amato's illegal lottery business. Accordingly, Johnson's sufficiency claim has no merit and trial counsel will not be found ineffective for failing to raise a meritless claim. *Commonwealth v. Woods*, 394 Pa.Super. 223, 232, 575 A.2d 601, 606 (1990).

## IV.

 Johnson and D'Amato next contend that statements of co-conspirators were improperly admitted through the testimony of Commonwealth witnesses Terri Harris, Lt. Kalmar and Steven Moore. This claim is meritless.

 Under the co-conspirator exception to the hearsay rule, statements of a non-testifying co-conspirator made in the course of the conspiracy are admissible provided a conspiracy exists between the non-testifying co-conspirator and the de-

fendant against whom the testimony is offered. *Commonwealth v. Pinkins,* 514 Pa. 418, 423–24, 525 A.2d 1189, 1191 (1987), *cert. denied,* 484 U.S. 867, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987).[14] Moreover, the exception applies even where no party has been formally charged with conspiracy or where a party has been acquitted of the conspiracy. *Commonwealth v. Dreibelbis,* 493 Pa. 466, 475, 426 A.2d 1111, 1115 (1981); *Commonwealth v. Pinkins, supra,* 514 Pa. at 424, 525 A.2d at 1191.

In the instant case, statements of Leroy Clacks, Jake D'Amato, and Steven Williams were introduced through the testimony of Terri Harris, Lt. Kalmar, and Steven Moore. Our review of the record reveals that all of the statements were made during the course of the conspiracy. Consequently, we find that the trial court did not err when it allowed the statements in under the co-conspirator's exception to the hearsay rule.

## V.

D'Amato and Johnson next contend that various testimony was improperly introduced by the Commonwealth and improperly excluded when offered by the defense. Specifically, they contend that the court erred by allowing testimony of Terri Harris, Lt. Kalmar and Officer Jones and by disallowing the defense from introducing "word on the street" evidence to support their theory that Leroy Clacks had acted alone. These claims are meritless.

■ D'Amato argues that the testimony of Terri Harris in which she made reference to Reggie Grant in connection with retaliation against Leroy Clacks for the Philson murder was inadmissible hearsay. However, the reference to statements about Grant and what he told Harris was elicited by the defense during cross-examination of Harris. N.T., Volume

---

14. Appellants assert that many of the co-conspirator's statements were not made in "furtherance of the conspiracy." However, our court has clearly stated that there is no such requirement for the admission of a co-conspirator's statements, so long as the statements are made during the conspiracy. *Commonwealth v. Basile,* 312 Pa.Super. 206, 213 n. 10, 458 A.2d 587, 590 n. 10 (1983).

III, May 14, 1990 at 198–99. Consequently, the defense may not now object to this testimony.

D'Amato and Johnson further complain that Lt. Kalmar was improperly permitted to testify concerning other lottery owners and operatives identified in the course of the trial or mentioned by D'Amato in his taped conversations. Our review of the record reveals that this information was elicited by the defense. N.T., Volume III, May 14, 1990 at 35–41. Consequently, the defense may not now object to the introduction of this testimony.

D'Amato and Johnson also contend that the rebuttal testimony of Officer Jones was improperly admitted. Officer Jones was called to rebut the extensive evidence of good reputation offered by Johnson. Indeed, Johnson not only placed in issue his character for being truthful, peaceful and law-abiding, but he specifically used his reputation witnesses to deny that he had any involvement in illegal lotteries. N.T., Volume VIII, May 21, 1990 at 10–11. D'Amato also offered a reputation witness who testified that he had never seen D'Amato with a gun and that D'Amato had no involvement with drugs. The witness also testified that D'Amato did not know Johnson. N.T., Volume VIII, May 21, 1990 at 16–21. Although evidence of the reputation of a defendant is not admissible in the Commonwealth's case-in-chief, it can be introduced on rebuttal once the defendant places his reputation in issue and "opens the door" to such a rebuttal. *Commonwealth v. Wojtczak*, 342 Pa.Super. 306, 313, 492 A.2d 1133, 1136 (1985). Consequently, we find that the rebuttal testimony of Officer Jones was properly received.

Finally, D'Amato and Johnson contend that the trial court improperly disallowed the defense from introducing "word on the street" rumors to support their theory that Leroy Clacks had acted alone in the murder of John Philson. On its face, such testimony would constitute inadmissible hearsay. Appellants do not offer any legal theory in support of the admissibility of such testimony, and our research does not reveal any theory in support of its admissibility. Conse-

quently, we do not find error in the trial court's sustaining of the Commonwealth's objections to such testimony.

## VI.

D'Amato and Johnson next contend that they were denied their right to confront witnesses through appropriate cross-examination. Specifically, they offer several examples of allegedly improper restrictions placed on the defense examination of Terri Harris, Steven Moore, Gene Swain, Jonathan White, Lt. Kalmar and Jeffrey Philson, the victim's brother. We disagree.

It is well-settled that the scope and manner of cross-examination are left to the discretion of the trial court judge and that his decisions will not be overturned absent an abuse of discretion. *Commonwealth v. Tyler*, 402 Pa.Super. 429, 436, 587 A.2d 326, 329 (1991).

D'Amato and Johnson also contend that they were denied adequate time to review the grand jury testimony of Terri Harris and that they were therefore unable to fully cross-examine her. Our review of the record reveals that following the direct testimony of Harris, the assistant district attorney provided defense counsel with the witness' grand jury testimony before the defense proceeded to cross-examination. The trial judge then specifically asked defense counsel if they would like a recess, to which defense counsel agreed. It was only later, when the jury had returned to the courtroom, that defense counsel for the first time requested an overnight recess. N.T., Volume III, May 14, 1990 at 179. That request was denied and cross-examination was commenced. After extensive cross-examination and recross-examination the trial judge asked, "Anything else?" *Id.* at 179–272. Since neither counsel indicated a desire to pursue further questioning, the witness was excused. It was not until three days after the witness was dismissed that defense counsel told the court that she had, "a lot more areas for examination." N.T., Volume VI, May 17, 1990 at 7. The trial court asked defense counsel what she wished to ask the appellant, but defense counsel's answers

were vague. Consequently, the trial court denied the request, but made it clear that the witness would be made available for use in the defense case. In light of the above facts, we cannot say that the defense was given insufficient time to review the grand jury testimony of the witnesses or that they were improperly restricted in their cross-examination of the witness.

D'Amato and Johnson next contend that their efforts to cross-examine Steven Moore were improperly curtailed. Our review of the record reveals that defense counsel extensively cross-examined Moore on his criminal record, prison difficulties, his drug use and whether he had been promised any sentencing consideration or leniency in exchange for his testimony. N.T., Volume VI, May 17, 1990 at 14–23, 35–44, 48, 63–65, 83. Thus, any claim as to insufficient cross-examination is meritless.[15]

Next in the defense litany of cross-examination complaints are the accusations of unfair limitations as to the examination of Jonathan White. White was called to refute the defense theory that D'Amato was just an old man who made things up. Since White was mentioned in the taped conversations with Lt. Kalmar he was called as a Common-

---

**15.** In addition, D'Amato and Johnson contend that they were improperly disallowed from impeaching Moore with non-crimen falsi offenses. Appellants cite to *Commonwealth v. Eubanks*, 511 Pa. 201, 512 A.2d 619 (1986), for the proposition that evidence of non-crimen falsi offenses is admissible and thus the trial court's restriction of cross-examination on this issue was improper. We disagree. In *Eubanks*, the Pennsylvania Supreme Court held that a rape complainant's prior murder conviction was relevant and admissible on cross-examination because it supported the defendant's version of the events leading up to the crime. *Eubanks*, however, did not hold that every irrelevant non-crimen falsi offense of a Commonwealth witness is admissible on cross-examination. We find that the impeachment of a witness with evidence of prior crimes is not governed by the fact-specific case of *Eubanks*, but rather by the Supreme Court's subsequent decision in *Commonwealth v. Randall*, 515 Pa. 410, 528 A.2d 1326 (1987). Under *Randall*, evidence of prior crimes is admissible to impeach the credibility of a witness provided the offense involved dishonesty or false statement. Here, the trial judge properly applied the *Randall* crimen falsi rule which allowed extensive impeachment of Moore by the defense on issue of prior crimen falsi offenses. Consequently, appellants are not entitled to relief.

wealth witness. White was cross-examined concerning his employment of gang members, his testimony at previous grand juries involving police corruption, his lottery operation, his numerous prior arrests, the fact that he had made payoffs to police officers and his appearance as a Commonwealth witness in other cases. N.T., Volume IV, May 15, 1990 at 85–87, 89–90, 94–97, 102–104. We find that this vigorous and extensive cross-examination more than satisfied the mandate of the confrontation clause.

▄▄ D'Amato and Johnson next contend that the lower court erred when it refused to let them review and use for purposes of cross-examination a police department Ethics Accountability Division file for Lt. Kalmar. This, too, is a meritless claim.

The file, which was subpoenaed and produced for review by the trial judge, contained no impeachment material. N.T., Volume II, May 11, 1990 at 72–75. Rather, it showed that the officer had been cleared of any wrongdoing and that, in his twenty years on the police force, he had never been the subject of disciplinary action. *Id.* at 73. Hence, this case is readily distinguishable from *Commonwealth v. Peetros*, 517 Pa. 260, 535 A.2d 1026 (1987), upon which appellants rely. In *Peetros* an officer had been disciplined and demoted for bribery. The court held that the prior disciplinary action was admissible to impeach the officer. *Id.*, 517 Pa. at 275, 535 A.2d at 1034. In the instant case, the file had no impeachment value, thus the trial court did not err in refusing the defense request to use the file for purposes of cross-examination.

Lastly, D'Amato and Johnson claim that they were improperly prevented from asking Jeffrey Philson about Terri Harris' appearance on the day after the murder.[16] This claim is meritless.

Our review the record reveals that this line of questioning was allowed. N.T., Volume I, May 10, 1990 at 193–194.

16. Harris testified that Leroy Clacks had beaten her because she had gone out with the victim. The defense sought to impeach her testimony by showing that Jeffrey Philson did not notice any bruises on Harris the day after the murder.

Moreover, Philson was not only cross-examined about Harris' appearance, but the defense was further permitted to read his prior statement to him, in front of the jury, in order to refresh his recollection. *Id.* at 194. Accordingly, appellants' claim must be denied.

## VII.

D'Amato and Johnson next contend that the trial court abused its discretion by permitting the introduction of demonstrative evidence, including photographs and a weapon, and in allowing the prosecutor to use and refer to a photograph display. In addition, they contend that evidence of threats against a Commonwealth witness was improperly allowed. We disagree.

D'Amato and Johnson contend that the trial court erred in allowing the introduction of black and white photographs of the victim. This claim is meritless.

The admission into evidence of photographs of the victim of a homicide or the location and scene of a crime lies within the sound discretion of the trial judge. *Commonwealth v. Garcia,* 505 Pa. 304, 313, 479 A.2d 473, 478 (1984). A photograph which is judged not inflammatory is admissible if it is relevant and can assist the jury in understanding the facts. *Id.,* 505 Pa. at 313, 479 A.2d at 478 (1984).

In the instant case, the trial court reviewed all of the photographs and excluded three that had the potential to be prejudicial. The other black and white photos depicted the deceased in his car as he was found by the police. Accordingly, these photos were relevant and assisted the jury in understanding the facts as to how the victim was shot, where he was shot and how he was found. The photos also corroborated the testimony of Terri Harris regarding the shooting. Consequently, the trial court's allowance of the photos was not an abuse of discretion.

D'Amato and Johnson next contend that a gun found in the home of co-defendant Williams' mother was improperly admit-

ted at trial. Whether this evidence could properly be admitted depends on its relevance.

A weapon may be admissible even where there is no proof that it is the actual murder weapon. *Commonwealth v. Yount*, 455 Pa. 303, 316, 314 A.2d 242, 249 (1974). All that is required before a weapon may be introduced into evidence is a sufficient foundation demonstrating circumstances justifying an inference of likelihood that the weapon was used in the course of the crime charged. *Commonwealth v. Fromal*, 392 Pa.Super. 100, 125, 572 A.2d 711, 724 (1990), *appeal denied*, 527 Pa. 629, 592 A.2d 1297. The Commonwealth is not compelled to establish that the particular weapon was the actual weapon used in the commission of the crime. *Id.*, 392 Pa.Super. at 125, 572 A.2d at 724. Moreover, a lack of proof that a weapon is the actual murder weapon goes to to the weight of the evidence but not its admissibility. *Commonwealth v. Coccioletti*, 493 Pa. 103, 110, 425 A.2d 387, 390 (1981).

In the instant case the gun was recovered from the home of co-defendant Williams' mother. This home is where Leroy Clacks and Steven Williams went after the meeting at which they were given the guns. N.T., Volume III, May 14, 1990 at 143. Thus, it can be inferred that Williams kept the gun at his mother's home and that he had access to it there. The record reveals that the gun had been disassembled and the key elements were destroyed, thus making conclusive identification difficult, if not impossible. N.T., Volume V, May 16, 1990 at 61, 69. We find that although the Commonwealth could not conclusively prove that the gun was the actual murder weapon, the weapon was relevant and properly introduced into evidence.

D'Amato and Johnson contend that the prosecutor was improperly permitted to use a board with photographs, names and nicknames of various people mentioned in the testimony, who worked for the lottery organization. We find no merit to this contention.

The decision to admit a chart or diagram is left to the sound discretion of the trial court. *Commonwealth v.*

*Cullen,* 340 Pa.Super. 233, 252, 489 A.2d 929, 938 (1985). A chart or diagram may be used at trial where it assists the jury in clarifying facts. *Commonwealth v. Hess,* 378 Pa.Super. 221, 238, 548 A.2d 582, 590 (1988). If the trial court could properly conclude that the exhibit would be helpful to the jury, the decision to admit the exhibit will likely be upheld on appeal. *Id.,* 378 Pa.Super. at 238, 548 A.2d at 590.

Instantly, the chart was used to help the jury keep track of the many participants in the lottery organization. The chart was especially appropriate because some of the persons involved in the organization had the same or similar nicknames. Accordingly, the chart was a valuable jury aid which promoted clarity and rational fact-finding. Hence, its use was not error.

Lastly, D'Amato and Johnson contend that the trial court erred in permitting the introduction of evidence of threats to Steven Moore and a threatening card sent to his mother. We disagree.

On cross-examination the defense extensively questioned Steven Moore about a letter Moore had sent to an assistant district attorney and a supposed promise of concessions in exchange for Moore's testimony. N.T., Volume VI, May 17, 1990 at 83–84. In response to this defense inquiry, the prosecutor properly elicited on redirect that the "concession" referred to by the defense involved Moore's agreement to testify provided he was moved away from people who had been threatening him while in prison. *Id.* at 84–88. This testimony and a threatening card mailed to the witness' mother were properly introduced as evidence of the witness' state of mind, bias and reason for testifying. *Commonwealth v. Dreibelbis,* 493 Pa. 466, 478–479, 426 A.2d 1111, 1117–1118 (1981). Moreover, the evidence of threats, which was only elicited after defense counsel had opened the door, was then followed by a cautionary instruction to the jury in which they were specifically told that the threatening card could not be considered against the defendants. N.T., Volume VI, May 17, 1990 at 125. Under these circumstances, we do not find that the court abused its discretion by allowing the introduction of this evidence.

## VIII.

D'Amato and Johnson next allege numerous instances of prosecutorial misconduct. Our review of the record reveals that the defense did not object to the alleged instances of prosecutorial misconduct. Consequently, we find these claims to be waived for failure to make a timely objection. *Commonwealth v. Redel,* 335 Pa.Super. 354, 363, 484 A.2d 171, 175 (1984).

## IX.

D'Amato and Johnson also allege several instances of judicial misconduct. Our review of the record reveals that the court's comments and interjections were a permissible exercise of judicial control to insure an orderly trial. *Commonwealth v. McGuire,* 339 Pa.Super. 320, 335–336, 488 A.2d 1144, 1152–1153 (1985). Consequently, appellants are not entitled to relief on this claim.

## X.

Appellant Johnson claims error based on the lower court's failure to grant him a severance. This claim is meritless.

The decision of whether to sever trials of co-defendants is within the sound discretion of the trial judge and will not be disturbed on appeal absent a manifest abuse of discretion. *Commonwealth v. Morales,* 508 Pa. 51, 61, 494 A.2d 367, 372 (1985). It is only where, in the trial court's opinion, resulting prejudice outweighs the needs of judicial economy that severance is necessary. *Commonwealth v. Harvey,* 407 Pa.Super. 545, 551, 595 A.2d 1280, 1284 (1991). The probability of antagonistic defenses is one of the factors that a court should consider in deciding whether to grant severance. *Commonwealth v. Morales, supra,* 508 Pa. at 62, 494 A.2d at 373. Moreover, joint trials are advisable where conspiracy is charged. *Commonwealth v. Jackson,* 451 Pa. 462, 464, 303 A.2d 924, 925 (1973).

Instantly, the evidence against D'Amato and Johnson was virtually identical, counsel pursued a common trial strate-

gy,[17] and both appellants were charged with conspiracy to commit murder and conspiracy to commit corrupt organizations. Consequently, the trial court did not abuse its discretion in denying the request for severance.

## XI.

Appellant, Johnson, contends that the trial court erred when it denied his motion to suppress Terri Harris' photographic identification of him and when it further denied his request for a cautionary instruction under *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820 (1954), *cert. denied*, 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954). Specifically, he argues that the out-of-court identification was unduly suggestive. Neither of these claims has any merit.

Where an out-of-court identification may be suggestive, a subsequent in-court identification of an accused as the perpetrator is admissible provided the in-court identification has a basis independent of the tainted out-of-court identification. *Commonwealth v. Green*, 321 Pa.Super. 246, 253, 467 A.2d 1346, 1349 (1983). The factors to be considered in determining whether the in-court identification testimony of the witness was based on their observations at the time of the crime and thus had a basis independent of the suggestive photographic array are: (1) the witness' opportunity to observe the criminal act; (2) the existence of any discrepancy between the witness' prior description of the criminal; (3) any identification of anyone other than the defendant; (4) any failure to identify the defendant; and (5) the lapse of time between the crime and the identification of the defendant. *Commonwealth v. McIntosh*, 328 Pa.Super. 255, 262, 476 A.2d 1316, 1319 (1984).

Instantly, we need not reach the issue of whether Terri Harris' out-of-court identification was unduly suggestive, because we find that her subsequent in-court identification had

17. Indeed, trial counsel for both D'Amato and Johnson not only cooperated closely during trial, they filed a single joint brief on post-verdict motions.

an "independent basis." Terri Harris knew Clarence Johnson and had seen him on several occasions. N.T., Volume III, May 14, 1990 at 125–129. In addition, her identification at trial was unequivocal. *Id.* at 136. Harris also testified that she knew Johnson because one of the other defendants (Williams) had specifically identified him to her before the murder. *Id.* at 140. In addition, Harris positively identified Johnson at the preliminary hearing and motion to suppress. In light of the above, we find that the witness did have an "independent basis" for her identification of Johnson and thus, the motion to suppress the in-court identification was properly denied.

 Johnson also contends that he was entitled to a cautionary instruction under *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820 (1954) which states,

> where the witness is not in a position to clearly observe the assailant, or he is not positive as to identity, or his positive statements as to identity are weakened by qualification or by failure to identify defendant on one or more occasions, the accuracy of the identification is so doubtful that the Court should warn the jury that the testimony as to identity must be received with caution.

*Id.*, 378 Pa. at 425–25, 106 A.2d at 826–27. Our review of the record reveals that Harris' identification of Johnson was unequivocal, consistent and independently based. Hence, there was no basis for a cautionary instruction under *Kloiber, supra.*

## XII.

D'Amato and Johnson contend that the trial court erred when it refused to give an accomplice charge as to the testimony of Terri Harris. This is a meritless contention.

 An accomplice charge or instruction is warranted when the evidence produced at trial either requires or permits a reasonable inference that the witness participated in the crime charged. *Commonwealth v. Franklin*, 397 Pa.Super. 265, 282, 580 A.2d 25, 34 (1990). In essence, an accomplice charge is only warranted where the witness was an active

partner with the intent to commit the crime. *Commonwealth v. Phillips,* 411 Pa.Super. 329, 340, 601 A.2d 816, 822 (1992).

Here, there was no evidence from which it could be reasonably inferred that Harris was an accomplice to the murder. She had no knowledge of the plot to kill Philson, she did not participate in the murder and afterwards she went into hiding solely because of threats made to her by Leroy Clacks. Harris' mere presence at the scene of the crime does not render her an accomplice. Hence, there was no need for an accomplice charge and the lower court appropriately refused to give one.

## XIII.

Finally, D'Amato and Johnson claim entitlement to relief based on "cumulative error." As each of appellants' claims has been found to be meritless, their claim of "cumulative error" is necessarily meritless as well. Accordingly, we affirm the judgment of sentence as to both appellants.

Judgments of sentence affirmed.